# BOSE CORP. *v.* CONSUMERS UNION OF UNITED STATES, INC.

No. 82–1246.   Argued November 8, 1983—Decided April 30, 1984

486

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., concurred in the judgment. WHITE, J., filed a dissenting opinion, *post*, p. 515. REHNQUIST, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 515.

*Charles Hieken* argued the cause for petitioner. With him on the briefs was *Blair L. Perry*.

*Michael N. Pollet* argued the cause for respondent. With him on the brief were *Marshall Beil* and *Carol A. Schrager*.*

JUSTICE STEVENS delivered the opinion of the Court.

An unusual metaphor in a critical review of an unusual loudspeaker system gave rise to product disparagement litigation that presents us with a procedural question of first impression: Does Rule 52(a) of the Federal Rules of Civil Procedure prescribe the standard to be applied by the Court of Appeals in its review of a District Court's determination that a false statement was made with the kind of "actual malice" described in *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964)?

In the May 1970 issue of its magazine, Consumer Reports, respondent published a seven-page article evaluating the quality of numerous brands of medium-priced loudspeakers. In a boxed-off section occupying most of two pages, respondent commented on "some loudspeakers of special interest,"

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *James F. McHugh, Charles S. Sims,* and *John Reinstein;* and for New York Times Co. et al. by *Floyd Abrams, Dean Ringel, Devereux Chatillon, Robert Sack, Alice Neff Lucan, Corydon B. Dunham, David Otis Fuller, Jr., W. Terry Maguire, Richard M. Schmidt, Jr., R. Bruce Rich,* and *Peter C. Gould.*

one of which was the Bose 901—an admittedly "unique and unconventional" system that had recently been placed on the market by petitioner.[1] After describing the system and some of its virtues, and after noting that a listener "could pinpoint the location of various instruments much more easily with a standard speaker than with the *Bose* system," respondent's article made the following statements:

> "Worse, individual instruments heard through the *Bose* system seemed to grow to gigantic proportions and tended to wander about the room. For instance, a violin appeared to be 10 feet wide and a piano stretched from wall to wall. With orchestral music, such effects seemed inconsequential. But we think they might become annoying when listening to soloists." Plaintiff's Exhibit 2, p. 274.

After stating opinions concerning the overall sound quality, the article concluded: "We think the *Bose* system is so unusual that a prospective buyer must listen to it and judge it for himself. We would suggest delaying so big an investment until you were sure the system would please you after the novelty value had worn off." *Id.*, at 275.

Petitioner took exception to numerous statements made in the article, and when respondent refused to publish a retraction, petitioner commenced this product disparagement action in the United States District Court for the District of Massachusetts.[2] After a protracted period of pretrial

---

[1] In introducing the loudspeaker system to the marketplace, petitioner emphasized the unconventional nature of the system and actively solicited reviews in numerous publications thereby inviting critical evaluation and comment on the unique qualities of the system. 508 F. Supp. 1249, 1273 (Mass. 1981).

[2] Federal jurisdiction over the product disparagement claim was based on diversity of citizenship, 28 U. S. C. § 1332(a)(1). The law of New York and Massachusetts, viewed by the parties as in accord in this area, governed the product disparagement claim. 508 F. Supp., at 1259, n. 17. The District Court held that under the applicable state law, plaintiff had

discovery, the District Court denied respondent's motion for summary judgment, 84 F. R. D. 682 (1980), and conducted a 19-day bench trial on the issue of liability. In its lengthy, detailed opinion on the merits of the case, 508 F. Supp. 1249 (1981), the District Court ruled in respondent's favor on most issues.[3] Most significantly, the District Court ruled that the petitioner is a "public figure" as that term is defined in *Gertz*

the burden of proving, by a preponderance of the evidence, that the statements in issue were false and disparaging, and also had the burden of establishing actual damages in order to recover. *Id.*, at 1259–1260. In addition to the product disparagement claim, petitioner alleged claims for unfair competition and a violation of the Lanham Act, 15 U. S. C. § 1121. The District Court held that neither of those claims had been proved. 508 F. Supp., at 1277.

[3] Petitioner's attack on the article included contentions that it was misleading in referring to two persons as a "panel" and in creating the impression that evaluations of loudspeaker quality are objective rather than subjective judgments. While the District Court agreed with petitioner on these points, it ruled that they did not entitle petitioner to relief. *Id.*, at 1260–1262. Petitioner also argued that the overall sound quality of the Bose 901 should have been rated higher by the reviewers. The District Court rejected this claim, observing that all of the testimony, including that of Dr. Bose, revealed that the evaluation of a speaker's "sound quality" or "accuracy" is a "subjective matter," and hence in the final analysis is "nothing more than an opinion and, as such, it cannot be proved to be true or false." *Id.*, at 1262. The court also found that petitioner had failed to prove false a statement recommending use of an amplifier of 50 watts per channel to achieve the "deepest" bass response with the speakers, observing that the parties had conceded that the power requirements of the speakers were readily and objectively ascertainable. *Id.*, at 1263–1264. The court also found that petitioner had failed to prove that the person primarily responsible for the article was biased by reason of his financial interest in eventually marketing a speaker on which he had obtained a patent. On the other hand, the District Court rejected respondent's argument that there could be no actual malice because respondent had no motive to distort the facts; the District Court identified two possible reasons for the disparagement, first, the "scant proof" that respondent had a "built in bias" against "higher priced products" and second, a suggestion in the testimony that respondent resorted to "sarcasm" to boost circulation. *Id.*, at 1275–1276. The District Court did not, however, rely upon these possible motivations as affirmative proof of actual malice. See *id.*, at 1276–1277.

v. *Robert Welch, Inc.*, 418 U. S. 323, 342, 345, 351–352 (1974), for purposes of this case and therefore the First Amendment, as interpreted in *New York Times Co.* v. *Sullivan*, 376 U. S., at 279–280, precludes recovery in this product disparagement action unless the petitioner proved by clear and convincing evidence that respondent made a false disparaging statement with "actual malice."

On three critical points, however, the District Court agreed with petitioner. First, it found that one sentence in the article contained a "false" statement of "fact" concerning the tendency of the instruments to wander.[4] Based primarily on testimony by the author of the article, the District Court found that instruments heard through the speakers tended to wander "along the wall," rather than "about the room" as reported by respondent.[5] Second, it found that

---

[4] In its ruling on respondent's motion for summary judgment, the District Court had held that the question whether respondent's panelists "actually heard instruments grow to gigantic proportions or wander about the room is a question of fact, not opinion . . . ." 84 F. R. D. 682, 684 (1980). In support of the motion for summary judgment, respondent had submitted an affidavit by one of the panelists, Arnold Seligson, stating that the article accurately reported what was heard in the tests and "I know what I heard," while petitioner had submitted an affidavit by Dr. Bose, who designed the Bose 901, stating in substance that "the phenomenon of widened and wandering instruments . . . is a scientific impossibility." *Ibid.*

[5] Although at one point the District Court seemed to suggest that the instruments, *i. e.*, the sound, did not wander at all, relying on a review in another publication stating that "*each instrument has its prescribed space—and it stays there,*" 508 F. Supp., at 1268 (emphasis supplied by the District Court) (citation omitted), the District Court had previously stated that some degree of "movement" of sound between loudspeakers is common to all systems and its discussion of liability indicates that respondent could have truthfully reported that the sound tended to wander "along the wall," or at least "seemed" to wander along the wall. It is not entirely clear that the District Court made a finding of fact as such regarding where the sound tended to wander. Indeed, it is not entirely clear that he found as a *fact* that the sound did not wander about the room. Rather, as discussed more extensively *infra*, at 493–497, the finding seemed to be that the "panel" conducting the test did not subjectively perceive the sound to

the statement was disparaging. Third, it concluded "on the basis of proof which it considers clear and convincing, that the plaintiff has sustained its burden of proving that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity." 508 F. Supp., at 1277.[6] Judgment was entered for petitioner on the product disparagement claim.[7]

The United States Court of Appeals for the First Circuit reversed. 692 F. 2d 189 (1982). The court accepted the finding that the comment about wandering instruments was

---

be wandering "about the room," but rather perceived it to be wandering "across the room." Just where the sound did "wander," in reality, did not appear to be the focus of the decision, though there was conflicting testimony concerning whether it was "scientifically impossible" for sound to wander "about" the room, or to "seem" to wander "about" the room. See 508 F. Supp., at 1267–1269, 1276–1277.

[6] In its ruling on the motion for summary judgment, the District Court assumed, without deciding, that the actual-malice standard would be applicable in the case and expressly recognized that falsity alone does not prove that statements were made with actual malice, observing that additional facts are required, and that there must be clear and convincing evidence on this question. 84 F. R. D., at 684–685. In holding that there was a material issue of "fact" (a label we use advisedly) on actual malice, the District Court recounted petitioner's argument that the panelists must have *known* the statements concerning enlarged and wandering instruments were false because they *were* false, *ibid.* ("[A]ccording to the plaintiff, the panel could not have heard these phenomena and the statement that they did hear them was false. The plaintiff further contends that because Seligson was a member of the listening panel . . . he must have known that the statement was false . . ."). The court also noted petitioner's evidence concerning Seligson's patent on a speaker system, and indulging in all reasonable inferences favorable to the plaintiff, concluded that a genuine issue of material fact existed on the question of actual malice. *Id.*, at 686.

[7] A separate trial before a different judge on the issue of damages resulted in a finding that the false disparaging statement resulted in a sales loss of 824 units, each of which would have produced a net profit of $129, causing petitioner damages of $106,296. Petitioner also was awarded $9,000 for expenses incurred in an attempt to mitigate damages. Judgment for the total amount, plus interest, was entered by the District Court. 529 F. Supp. 357 (1981).

disparaging. It assumed, without deciding, that the statement was one of fact, rather than opinion, and that it was false, observing that "stemming at least in part from the uncertain nature of the statement as one of fact or opinion, it is difficult to determine with confidence whether it is true or false." *Id.*, at 194. After noting that petitioner did not contest the conclusion that it was a public figure, or the applicability of the *New York Times* standard, the Court of Appeals held that its review of the "actual malice" determination was not "limited" to the clearly-erroneous standard of Rule 52(a); instead, it stated that it "must perform a de novo review, independently examining the record to ensure that the district court has applied properly the governing constitutional law and that the plaintiff has indeed satisfied its burden of proof." *Id.*, at 195. It added, however, that it "[was] in no position to consider the credibility of witnesses and must leave questions of demeanor to the trier of fact." *Ibid.* Based on its own review of the record, the Court of Appeals concluded:

> "[W]e are unable to find clear and convincing evidence that CU published the statement that individual instruments tended to wander about the room with knowledge that it was false or with reckless disregard of whether it was false or not. The evidence presented merely shows that the words in the article may not have described precisely what the two panelists heard during the listening test. CU was guilty of using imprecise language in the article—perhaps resulting from an attempt to produce a readable article for its mass audience. Certainly this does not support an inference of actual malice." *Id.*, at 197.[8]

---

[8] Judge Campbell concurred specially to emphasize the fact that the Court of Appeals had not passed on the merits of the District Court's holding that petitioner was a public figure. We, of course, also do not pass on that question.

We observe that respondent's publication of Consumer Reports plainly would qualify it as a "media" defendant in this action under any conceivable

We granted certiorari to consider whether the Court of Appeals erred when it refused to apply the clearly-erroneous standard of Rule 52(a) to the District Court's "finding" of actual malice.   461 U. S. 904 (1983).

## I

To place the issue in focus, it is necessary to state in somewhat greater detail (a) the evidence on the "actual malice" issue; and (b) the basis for the District Court's determination.

### Evidence of Actual Malice.

At trial petitioner endeavored to prove that the key sentence embodied three distinct falsehoods about instruments heard through the Bose system: (1) that their size seemed grossly enlarged; (2) that they seemed to move; and (3) that their movement was "about the room."

Although a great deal of the evidence concerned the first two points, the District Court found that neither was false. It concluded that the average reader would understand that the reference to enlarged instruments was intended to describe the size of the area from which the sound seemed to emanate rather than to any perception about the actual size of the musical instruments being played, rejecting as "absurd" the notion that readers would interpret the figurative language literally.   508 F. Supp., at 1266.[9]   After referring to testimony explaining that "a certain degree of movement

definition of that term.   Hence, the answer to the question presented in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, cert. granted, 464 U. S. 959 (1983), could not affect this case and we naturally express no view at this time on that question.

[9] "Therefore, the plaintiff did not present any evidence to contradict the defendant's evidence which tended to show that when listening to the Bose 901 a listener could and does perceive that the apparent sound source is very large.   Thus, the court concludes that the plaintiff has not sustained its burden of proof by a preponderance of the evidence that the defendant's statement—'instruments . . . seemed to grow to gigantic proportions'—was false."   508 F. Supp., at 1267.

of the location of the apparent sound source is to be expected with all stereo loudspeaker systems," the District Court recognized that the statement was accurate insofar as it reported that "instruments . . . tended to wander . . . ." *Id.*, at 1267. Thus, neither the reference to the apparent size of the instruments, nor the reference to the fact that instruments appeared to move, was false.[10]

The statement that instruments tended to wander "about the room" was found false because what the listeners in the test actually perceived was an apparent movement back and forth along the wall in front of them and between the two speakers. Because an apparent movement "about the room"—rather than back and forth—would be so different from what the average listener has learned to expect, the District Court concluded that "the location of the movement of the apparent sound source is just as critical to a reader as the fact that movement occurred." *Ibid.*

The evidence concerning respondent's knowledge of this falsity focused on Arnold Seligson, an engineer employed by respondent. Seligson supervised the test of the Bose 901 and prepared the written report upon which the published article was based. His initial in-house report contained this sentence: " 'Instruments not only could not be placed with precision but appeared to suffer from giganticism and a tendency to wander around the room; a violin seemed about 10 ft. wide, a piano stretched from wall to wall, etc.' " *Id.*, at 1264, n. 28. Since the editorial revision from "around the room" to "about the room" did not change the meaning of the false statement, and since there was no evidence that the editors were aware of the inaccuracy in the original report, the actual-malice determination rests entirely on an evaluation of Seligson's state of mind when he wrote his initial report, or when he checked the article against that report.

---

[10] Thus, respondent prevailed on both of the issues of fact that had been identified at the summary judgment stage of the proceedings. See n. 4, *supra.*

Seligson was deposed before trial and testified for almost six days at the trial itself. At one point in his direct examination, he responded at length to technical testimony by Dr. Bose, explaining the scientific explanation for the apparent movement of the source of sound back and forth across a wall. App. 117–122. The trial judge then questioned Seligson, and that questioning revealed that the movement which Seligson had heard during the tests was confined to the wall.[11] During his cross-examination, at counsel's request he drew a rough sketch of the movement of the sound source that he intended to describe with the words "tended to wander about the room"; that sketch revealed a back and forth movement along the wall between the speakers. He was then asked:

"Q. Mr. Seligson, why did you use the words 'tended to wander about the room' to describe what you have drawn on the board?

"A. Well, I don't know what made me pick that particular choice of words. Would you have been more sat-

---

[11] The following questions were asked and answered:

"[Q.] Does that explain, in your opinion, the lateral movement of the instrument?

"[A.] Yes.

"[Q.] I think your statement in the article which says they moved into the room, just as if they came forward, as well—

"[A.] The example given for the movement into the room refers only to a widened violin and a widened piano and was meant to imply only that the widening and movement was across the rear wall from the two speakers.

. . . . .

"[Q.] 'It tended to wander about the room.' It didn't say from side to side or against the walls alone, but it says—

"[A.] I believe the next sentence is meant to explain that. It then says, 'For instance,' as an example of the effect. . . .

"[Q.] The word 'about' means around, doesn't it?

"[A.] It was, your Honor, it was meant to mean about the rear wall, between the speakers.

"[Q.] That isn't what it says, though.

"[A.] I understand." App. 122–124.

isfied if we said 'across,'—I think not—instead of before. I have the feeling you would have objected in either event. The word 'about' meant just as I drew it on the board. Now, I so testified in my deposition." *Id.,* at 169.[12]

### The District Court's Actual-Malice Determination.

The District Court's reasons for finding falsity in the description of the location of the movement of the wandering instruments provided the background for its ruling on actual malice. The court concluded that "no reasonable reader" would understand the sentence as describing lateral movement along the wall. Because the "average reader" would interpret the word "about" according to its "plain ordinary meaning," the District Court unequivocally rejected Seligson's testimony—and respondent's argument—that the sentence, when read in context, could be understood to refer to lateral movement.[13]

---

[12] These additional questions were then asked and answered:

"Q. Would it have been more accurate in your judgment to say that the instruments tended to move back and forth between the two speakers?

"A. No, I don't think so, taken in context of the way it's described. Remember, the effect is carefully described in a few sentences later. It's hard to mistake.

"Q. Is there anything in the article which you think conveys to the reader the idea that the instruments stayed down at one end of the room and didn't come out and wander about, like you wandered about, where you have drawn the orange line?

"A. Yes.

"Q. What is that?

"A. I would think that the reader would get that from reading that a violin appeared to be ten feet wide and a piano stretched from wall to wall. This is no hint of depth or whatever, entering into the room." *Id.,* at 169–170.

[13] The District Court buttressed this conclusion by pointing out that petitioner had received no complaints from purchasers about any wandering instruments, and that no other reviews of the Bose 901 had referred to wandering instruments. On the contrary, a review quoted by the District

On similar reasoning the District Court found Seligson's above-quoted explanation of the intended meaning of the sentence incredible. The District Court reasoned:

"Thus, according to Seligson, the words used in the Article—'About the room'—mean something different to him than they do to the populace in general. If Seligson is to be believed, at the time of publication of the Article he interpreted, and he still interprets today, the words 'about the room' to mean 'along the wall.' After careful consideration of Seligson's testimony and of his demeanor at trial, the Court finds that Seligson's testimony on this point is not credible. Seligson is an intelligent person whose knowledge of the English language cannot be questioned. It is simply impossible for the Court to believe that he interprets a commonplace word such as 'about' to mean anything other than its plain ordinary meaning.

"Based on the above finding that Seligson's testimony to the contrary is not credible, the Court further finds that at the time of the Article's publication Seligson knew that the words 'individual instruments . . . tended to wander about the room' did not accurately describe the effects that he and Lefkow had heard during the 'special listening test.' Consequently, the Court concludes, on the basis of proof which it considers clear and convincing, that the plaintiff has sustained its burden of proving that the defendant published a false statement of material fact with the knowledge that it was false or with reckless disregard of its truth or falsity." 508 F. Supp., at 1276–1277.

---

Court commented that "each instrument has its prescribed space—and it stays there." See n. 5, *supra.* This evidence, however, was more probative of falsity in ascribing any movement at all to the sound source than of falsity in describing the location of the movement. As we have pointed out, the District Court found that the article was truthful insofar as it stated that apparent movement occurred.

Notably, the District Court's ultimate determination of actual malice was framed as a conclusion and was stated in the disjunctive. Even though the District Court found it impossible to believe that Seligson—at the time of trial—was truthfully maintaining that the words "about the room" could fairly be read, in context, to describe lateral movement rather than irregular movement throughout the room, the District Court did not identify any independent evidence that Seligson realized the inaccuracy of the statement, or entertained serious doubts about its truthfulness, at the time of publication.[14]

## II

This is a case in which two well-settled and respected rules of law point in opposite directions.

Petitioner correctly reminds us that Rule 52(a) provides:

> "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

We have repeatedly held that the Rule means what it says. *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 855–856 (1982); *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287 (1982); *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 394–396 (1948). It surely does not stretch the language of the Rule to characterize an inquiry into what a person knew at a given point in time as a question of "fact."[15] In this case, since the trial judge expressly commented on Seligson's credibility, petitioner argues that the

---

[14] The District Court expressly rejected petitioner's exhaustive attempt to prove that Seligson had a continuing interest in marketing his own speaker and therefore deliberately distorted the review. 508 F. Supp., at 1275.

[15] Indeed, in *Herbert* v. *Lando*, 441 U. S. 153, 170 (1979), we referred in passing to actual malice as "ultimate fact."

Court of Appeals plainly erred when it refused to uphold the District Court's actual-malice "finding" under the clearly-erroneous standard of Rule 52(a).

On the other hand, respondent correctly reminds us that in cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan,* 376 U. S., at 284–286. See also *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886, 933–934 (1982); *Greenbelt Cooperative Publishing Assn.* v. *Bresler,* 398 U. S. 6, 11 (1970); *St. Amant* v. *Thompson,* 390 U. S. 727, 732–733 (1968). Although such statements have been made most frequently in cases to which Rule 52(a) does not apply because they arose in state courts, respondent argues that the constitutional principle is equally applicable to federal litigation. We quite agree; surely it would pervert the concept of federalism for this Court to lay claim to a broader power of review over state-court judgments than it exercises in reviewing the judgments of intermediate federal courts.

Our standard of review must be faithful to both Rule 52(a) and the rule of independent review applied in *New York Times Co.* v. *Sullivan.* The conflict between the two rules is in some respects more apparent than real. The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record; Rule 52(a) never forbids such an examination, and indeed our seminal decision on the Rule expressly contemplated a review of the entire record, stating that a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court *on the entire evidence* is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co., supra,* at 395 (emphasis supplied). Moreover, Rule 52(a) commands that "due regard" shall be given to the trial judge's opportunity to

observe the demeanor of the witnesses; the constitutionally based rule of independent review permits this opportunity to be given its due.    Indeed, as we previously observed, the Court of Appeals in this case expressly declined to second-guess the District Judge on the credibility of the witnesses.

The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others.    The same "clearly erroneous" standard applies to findings based on documentary evidence as to those based entirely on oral testimony, see *United States Gypsum Co.*, *supra*, at 394, but the presumption has lesser force in the former situation than in the latter.    Similarly, the standard does not change as the trial becomes longer and more complex, but the likelihood that the appellate court will rely on the presumption tends to increase when trial judges have lived with the controversy for weeks or months instead of just a few hours.[16]    One might therefore assume that the cases in which the appellate courts have a duty to exercise

---

[16] "The conclusiveness of a 'finding of fact' depends on the nature of the materials on which the finding is based.    The finding even of a so-called 'subsidiary fact' may be a more or less difficult process varying according to the simplicity or subtlety of the type of 'fact' in controversy.    Finding so-called ultimate 'facts' more clearly implies the application of standards of law.    And so the 'finding of fact' even if made by two courts may go beyond the determination that should not be set aside here.    Though labeled 'finding of fact,' it may involve the very basis on which judgment of fallible evidence is to be made.    Thus, the conclusion that may appropriately be drawn from the whole mass of evidence is not always the ascertainment of the kind of 'fact' that precludes consideration by this Court.    See, *e. g.*, *Beyer* v. *LeFevre*, 186 U. S. 114.    Particularly is this so where a decision here for review cannot escape broadly social judgments—judgments lying close to opinion regarding the whole nature of our Government and the duties and immunities of citizenship." *Baumgartner* v. *United States*, 322 U. S. 665, 670–671 (1944).    See generally *Pullman-Standard* v. *Swint*, 456 U. S. 273, 286–287, n. 16 (1982).

independent review are merely those in which the presumption that the trial court's ruling is correct is particularly weak. The difference between the two rules, however, is much more than a mere matter of degree. For the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge.

Rule 52(a) applies to findings of fact, including those described as "ultimate facts" because they may determine the outcome of litigation. See *Pullman-Standard* v. *Swint*, 456 U. S., at 287. But Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law. See *ibid.; Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S., at 855, n. 15. Nor does Rule 52(a) "furnish particular guidance with respect to distinguishing law from fact." *Pullman Standard* v. *Swint*, 456 U. S., at 288. What we have characterized as "the vexing nature" of that distinction, *ibid.*, does not, however, diminish its importance, or the importance of the principles that require the distinction to be drawn in certain cases.[17]

In a consideration of the possible application of the distinction to the issue of "actual malice," at least three characteristics of the rule enunciated in the *New York Times* case are

---

[17] A finding of fact in some cases is inseparable from the principles through which it was deduced. At some point, the reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment. Where the line is drawn varies according to the nature of the substantive law at issue. Regarding certain largely factual questions in some areas of the law, the stakes—in terms of impact on future cases and future conduct—are too great to entrust them finally to the judgment of the trier of fact.

relevant.  First, the common-law heritage of the rule itself assigns an especially broad role to the judge in applying it to specific factual situations.  Second, the content of the rule is not revealed simply by its literal text, but rather is given meaning through the evolutionary process of common-law adjudication; though the source of the rule is found in the Constitution, it is nevertheless largely a judge-made rule of law. Finally, the constitutional values protected by the rule make it imperative that judges—and in some cases judges of this Court—make sure that it is correctly applied.  A few words about each of these aspects of the rule are appropriate.

The federal rule that prohibits a public official from recovering damages for a defamatory falsehood unless he proves that the false "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times*, 376 U. S., at 279–280, has its counterpart in rules previously adopted by a number of state courts and extensively reviewed by scholars for generations.[18]  The earlier defamation cases, in turn, have a kinship to English cases considering the kind of motivation that must be proved to support a common-law action for deceit.[19]  It has long been recognized that the formulation of a rule of this kind "allows the judge the maximum of power in passing judgment in the particular case."[20]

---

[18] A representative list of such cases and comments is found in footnote 20 of the Court's opinion in *New York Times*, 376 U. S., at 280.

[19] Under what has been characterized as the "honest liar" formula, fraud could be proved "when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false." *Derry* v. *Peek*, 14 App. Cas. 337, 374 (1889).

[20] "Probably the formula is less definite than it seems.  Its limitations are perhaps largely a matter of language color.  As do most English formulas, it allows the judge the maximum of power in passing judgment in the particular case.  It restricts the jury as neatly as can be done to the function of evaluating the evidence.  But judgment under this formula can be turned either way with equal facility on any close case."  L. Green, Judge and Jury 286 (1930) (Chapter 10 of this work by Professor Green, cited herein, is also published in 16 Va. L. Rev. 749 (1930)).

Moreover, the exercise of this power is the process through which the rule itself evolves and its integrity is maintained.[21] As we have explained, the meaning of some concepts cannot be adequately expressed in a simple statement:

"These considerations fall short of proving St. Amant's reckless disregard for the accuracy of his statements about Thompson. 'Reckless disregard,' it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication." *St. Amant* v. *Thompson,* 390 U. S., at 730–731.

When the standard governing the decision of a particular case is provided by the Constitution, this Court's role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance. This process has been vitally important in cases involving restrictions on the freedom of speech protected by the First Amendment, particularly in those cases in which it is contended that the communication in issue is within one of the few classes of "unprotected" speech.

The First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a

---

[21] "And it must be kept in mind that the judge has another distinct function in dealing with these elements, which though not frequently called into play, is of the utmost importance. It involves the determination of the *scope* of the general formula, or some one of its elements. It comes into play in the marginal cases. It requires the judge to say what sort of conduct can be considered as condemned under the rules which are employed in such cases. It is the function through which the formulas and rules themselves were evolved, through which their integrity is maintained and their availability determined." Green, *supra,* at 304.

whole. Under our Constitution "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 339–340 (footnote omitted). Nevertheless, there are categories of communication and certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942).

Libelous speech has been held to constitute one such category, see *Beauharnais* v. *Illinois*, 343 U. S. 250 (1952); others that have been held to be outside the scope of the freedom of speech are fighting words, *Chaplinsky* v. *New Hampshire, supra,* incitement to riot, *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969), obscenity, *Roth* v. *United States*, 354 U. S. 476 (1957), and child pornography, *New York* v. *Ferber*, 458 U. S. 747 (1982).[22] In each of these

---

[22] Commercial speech was once regarded as unprotected by the First Amendment, see *Valentine* v. *Chrestensen*, 316 U. S. 52 (1942), but in *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), we rejected that broad conclusion. Though false and misleading commercial speech could be deemed to represent a category of unprotected speech, see *ibid.*, the rationale for doing so would be essentially the same as that involved in the libel area, viz., "there is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974). Moreover, since a commercial advertiser usually "seeks to disseminate information about a specific product or service he himself provides and presumably knows more about than anyone else," *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 772, n. 24, there is a minimal "danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression." *Id.*, at 777 (Stewart, J., concurring).

Statements made by public employees in their employment capacity and not touching on matters of public concern may be considered unprotected

areas, the limits of the unprotected category, as well as the unprotected character of particular communications, have been determined by the judicial evaluation of special facts that have been deemed to have constitutional significance. In such cases, the Court has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited. Providing triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas.[23] The principle of viewpoint neutrality that underlies the First Amendment itself, see *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972), also imposes a special responsibility on judges whenever it is claimed that a particular communication is unprotected. See generally *Terminiello* v. *Chicago*, 337 U. S. 1, 4 (1949).

We have exercised independent judgment on the question whether particular remarks "were so inherently inflammatory as to come within that small class of 'fighting words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace,'" *Street* v. *New York*, 394 U. S. 576, 592 (1969), and on the analogous question whether advocacy is directed to inciting or producing

in the sense that employment-related sanctions may be imposed on the basis of such statements. See *Connick* v. *Myers*, 461 U. S. 138 (1983); *Givhan* v. *Western Line Consolidated School District*, 439 U. S. 410 (1979); *Pickering* v. *Board of Education*, 391 U. S. 563 (1968).

[23] The risk of broadening a category of unprotected speech may explain why one Member of this Court preferred a candid statement—"I know it when I see it"—of his concept of the judicial function to a premature attempt to fashion an all encompassing "shorthand description" of obscenity. See *Jacobellis* v. *Ohio*, 378 U. S. 184, 197 (1964) (Stewart, J., concurring).

imminent lawless action, *Hess* v. *Indiana*, 414 U. S. 105, 108–109 (1973) *(per curiam);* compare *id.*, at 111 (REHN-QUIST, J., dissenting) ("The simple explanation for the result in this case is that the majority has interpreted the evidence differently from the courts below"); *Edwards* v. *South Carolina*, 372 U. S. 229, 235 (1963) (recognizing duty "to make an independent examination of the whole record"); *Pennekamp* v. *Florida*, 328 U. S. 331, 335 (1946) ("[W]e are compelled to examine for ourselves the statements in issue . . . to see whether or not they do carry a threat of clear and present danger . . . or whether they are of a character which the principles of the First Amendment . . . protect").[24]

Similarly, although under *Miller* v. *California*, 413 U. S. 15 (1973), the questions of what appeals to "prurient interest" and what is "patently offensive" under the community stand-ard obscenity test are "essentially questions of fact," *id.*, at 30, we expressly recognized the "ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary," *id.*, at 25.[25]   We have therefore

[24] See also *Fiske* v. *Kansas*, 274 U. S. 380, 385–387 (1927) (explaining that this Court will review findings of fact by a state court where a federal right has been denied on the basis of a fact without evidence to support it and where a conclusion of law as to a federal right and a finding of fact are so intermingled to require analysis of the facts); *Gitlow* v. *New York*, 268 U. S. 652, 665–666 (1925); *Schaefer* v. *United States*, 251 U. S. 466, 483 (1920) (Brandeis, J., dissenting); see generally *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613–614 (1973) (explaining *Edwards* v. *South Carolina*, 372 U. S. 229 (1963); *Cox* v. *Louisiana*, 379 U. S. 536 (1965); and *Cantwell* v. *Connecticut*, 310 U. S. 296, 311 (1940)).

[25] In support of this statement, we cited Justice Harlan's opinion in *Roth* v. *United States*, 354 U. S. 476, 497–498 (1957), where he observed:

"The Court seems to assume that 'obscenity' is a peculiar *genus* of 'speech and press,' which is as distinct, recognizable, and classifiable as poison ivy is among other plants.   On this basis the *constitutional* question before us simply becomes, as the Court says, whether 'obscenity,' as an abstraction, is protected by the First and Fourteenth Amendments, and the question whether a *particular* book may be suppressed becomes a mere matter of

rejected the contention that a jury finding of obscenity *vel non* is insulated from review so long as the jury was properly instructed and there is some evidence to support its findings, holding that substantive constitutional limitations govern. In *Jenkins* v. *Georgia,* 418 U. S. 153, 159–161 (1974), based on an independent examination of the evidence—the exhibition of a motion picture—the Court held that the film in question "could not, as a matter of constitutional law, be found to depict sexual conduct in a patently offensive way . . . ." *Id.,* at 161.[26]   And in its recent opinion identifying a new category of unprotected expression—child pornography—the Court expressly anticipated that an "independent

---

classification, of 'fact,' to be entrusted to a factfinder and insulated from independent constitutional judgment.   But surely the problem cannot be solved in such a generalized fashion.   Every communication has an individuality and 'value' of its own.   The suppression of a particular writing or other tangible form of expression is, therefore, an individual matter, and in the nature of things every such suppression raises an individual constitutional problem, in which a reviewing court must determine for *itself* whether the attacked expression is suppress[i]ble within constitutional standards.   Since those standards do not readily lend themselves to generalized definitions, the constitutional problem in the last analysis becomes one of particularized judgments which appellate courts must make for themselves.

"I do not think that reviewing courts can escape this responsibility by saying that the trier of facts, be it a jury or a judge, has labeled the questioned matter as 'obscene,' for, if 'obscenity' is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind."

[26] Cf. *Hamling* v. *United States,* 418 U. S. 87, 100, 124 (1974) (holding that jury determination of obscenity was supported by the evidence and consistent with the applicable constitutional standard while reviewing petitioner's sufficiency of the evidence arguments regarding other issues under the test of *Glasser* v. *United States,* 315 U. S. 60 (1942)).   See generally *Jacobellis* v. *Ohio,* 378 U. S., at 187–190 (opinion of BRENNAN, J.) (*de novo* review required in obscenity cases); *id.,* at 202–203 (Warren, C. J., dissenting) (intermediate standard of review).

examination" of the allegedly unprotected material may be necessary "to assure ourselves that the judgment . . . 'does not constitute a forbidden intrusion on the field of free expression.'" *New York* v. *Ferber,* 458 U. S., at 774, n. 28 (quoting *New York Times Co.* v. *Sullivan,* 376 U. S., at 285).

Hence, in *New York Times Co.* v. *Sullivan,* after announcing the constitutional requirement for a finding of "actual malice" in certain types of defamation actions, it was only natural that we should conduct an independent review of the evidence on the dispositive constitutional issue. We explained our action as follows:

> "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' *Speiser* v. *Randall,* 357 U. S. 513, 525. In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' *Pennekamp* v. *Florida,* 328 U. S. 331, 335; see also *One, Inc.* v. *Olesen,* 355 U. S. 371; *Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372. We must 'make an independent examination of the whole record,' *Edwards* v. *South Carolina,* 372 U. S. 229, 235, so as to assure ourselves that the judgment does not constitute a forbidden instrusion on the field of free expression." 376 U. S., at 285 (footnote omitted).[27]

---

[27] This Court "has an 'obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments,' and in doing so 'this Court cannot avoid making an independent constitutional judgment on the

In *Time, Inc.* v. *Pape*, 401 U. S. 279 (1971), a case in which the Federal District Court had entered a directed verdict, we again conducted an independent examination of the evidence on the question of actual malice, labeling our definition of "actual malice" as a "constitutional rule" and stating that the question before us was whether that rule had been correctly applied to the facts of the case, *id.*, at 284. Again we stated that independent inquiries "of this kind are familiar under the settled principle that '[i]n cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will re-

facts of the case.' *Jacobellis* v. *Ohio*, 378 U. S. 184, 190 (1964) [opinion of BRENNAN, J.]. The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's *de novo* review. See *Edwards* v. *South Carolina*, 372 U. S. 229, 235 (1963); *Blackburn* v. *Alabama*, 361 U. S. 199, 205 n. 5 (1960)." *Rosenbloom* v. *Metromedia*, 403 U. S. 29, 54 (1971) (opinion of BRENNAN, J., joined by BURGER, C. J., and BLACK-MUN, J.). See generally *Adams* v. *Tanner*, 244 U. S. 590, 600 (1917) (Brandeis, J., dissenting) (*"Ex facto jus oritur*. That ancient rule must prevail in order that we may have a system of living law").

In *New York Times Co.* v. *Sullivan*, we were reviewing a state-court judgment entered on a jury verdict. Respondent had contended that the Seventh Amendment precluded an independent review. Recognizing that the Seventh Amendment's ban on reexamination of facts tried by a jury applied to a case coming from the state courts, *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 243–246 (1897); *The Justices* v. *Murray*, 9 Wall. 274 (1870); see generally *Parsons* v. *Bedford*, 3 Pet. 433 (1830), we found the argument without merit, relying on our statement in *Fiske* v. *Kansas*, 274 U. S., at 385–386, that review of findings of fact is appropriate "where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts."

The intermingling of law and fact in the actual-malice determination is no greater in state or federal jury trials than in federal bench trials. See *supra*, at 499–500, and *infra*, at 512–513. And, of course, the limitation on appellate review of factual determinations under Rule 52(a) is no more stringent than the limitation on federal appellate review of a jury's factual determinations under the Seventh Amendment, which commands that "no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

examine the evidentiary basis on which those conclusions are founded,'" noting that "in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review 'the evidence in the . . . record to determine whether it could constitutionally support a judgment' for the plaintiff." *Ibid.* (citations omitted).[28]

In *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 277 (1971) the Court held "as a matter of constitutional law" that the jury could not be allowed to determine the relevance of a defamatory statement to the plaintiff's status as a public figure. We explained that the jury's application of such a standard "is unlikely to be neutral with respect to the content of speech and holds a real danger of becoming an instrument for the suppression of those 'vehement, caustic, and sometimes unpleasantly sharp attacks,' *New York Times, supra,* at 270, which must be protected if the guarantees of the First and Fourteenth Amendments are to prevail." *Ibid.*[29]

The requirement of independent appellate review reiterated in *New York Times Co.* v. *Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—must

---

[28] Justice Harlan, the lone dissenter in *Time, Inc.* v. *Pape,* observed that the Court had merely refound the facts in the case, but agreed that the Court was free to examine for itself the evidentiary bases upon which the decision below rested. He argued that this power need not be exercised in every case, but rather independent review of the evidence should be limited to cases in which certain "unusual factors" exist, such as "allegations of harassment." 401 U. S., at 294.

[29] A similar concern with the need to "preserve the right of free speech both from suppression by tyrannous, well-meaning majorities and from abuse by irresponsible, fanatical minorities," *Schaefer* v. *United States,* 251 U. S., at 482 (dissenting opinion), was identified by Justice Brandeis in explaining the special risk in allowing jurors to evaluate the character of the "clear and present danger" presented by arguably seditious speech.

exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

## III

The Court of Appeals was correct in its conclusions (1) that there is a significant difference between proof of actual malice[30] and mere proof of falsity, and (2) that such additional proof is lacking in this case.

The factual portion of the District Court's opinion may fairly be read as including the following findings: (1) Seligson's actual perception of the apparent movement of the sound source at the time the Bose 901 was tested was "along the wall" rather than "about the room"; (2) even when the words in the disputed sentence are read in the context of the entire article, neither the "average reader," nor any other intelligent person, would interpret the word "about" to mean "across"; (3) Seligson is an intelligent, well-educated person; (4) the words "about the room" have the same meaning for Seligson as they do for the populace in general; and (5) although he was otherwise a credible witness, Seligson's testimony that (a) he did not "know what made me pick that

---

[30] The burden of proving "actual malice" requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement. See, e. g., New York Times Co. v. Sullivan, 376 U. S., at 280; see also Gertz v. Robert Welch, Inc., 418 U. S., at 342; St. Amant v. Thompson, 390 U. S. 727, 731 (1968); see generally W. Prosser, Law of Torts 771–772, 821 (4th ed. 1971).

particular choice of words" and (b) that the word "about" meant what he had drawn on the board, is not credible.

When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion. See *Moore* v. *Chesapeake & Ohio R. Co.*, 340 U. S. 573, 575 (1951). In this case the trial judge found it impossible to believe that Seligson continued to maintain that the word "about" meant "across." Seligson's testimony does not rebut any inference of actual malice that the record otherwise supports, but it is equally clear that it does not constitute clear and convincing evidence of actual malice. Seligson displayed a capacity for rationalization. He had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made—that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication.

Aside from Seligson's vain attempt to defend his statement as a precise description of the nature of the sound movement, the only evidence of actual malice on which the District Court relied was the fact that the statement was an inaccurate description of what Seligson had actually perceived. Seligson of course had insisted "I know what I heard." The trial court took him at his word, and reasoned that since he did know what he had heard, and he knew that the meaning of the language employed did not accurately reflect what he heard, he must have realized the statement was inaccurate at the time he wrote it. "Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account *of events that speak for themselves.*" *Time, Inc.* v. *Pape*, 401 U. S., at 285. See generally *The Santissima Trinidad*, 7 Wheat. 283, 338–339 (1822). Here, however, adoption of the language chosen was "one of a number of possible rational interpretations" of an event "that bristled with ambiguities" and descriptive challenges for the writer.

*Time, Inc.* v. *Pape, supra,* at 290. The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella. Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time.

The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies. 401 U. S., at 292. "Realistically, . . . some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times, Butts, Gertz,* and similar cases to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material." *Herbert* v. *Lando,* 441 U. S. 153, 171–172 (1979). "[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times Co.* v. *Sullivan,* 376 U. S., at 271–272 (citation omitted).

The Court of Appeals entertained some doubt concerning the ruling that the *New York Times* rule should be applied to a claim of product disparagement based on a critical review of a loudspeaker system. We express no view on that ruling, but having accepted it for purposes of deciding this case, we agree with the Court of Appeals that the difference between hearing violin sounds move around the room and hearing them wander back and forth fits easily within the breathing space that gives life to the First Amendment. We may accept all of the purely factual findings of the District Court and nevertheless hold as a matter of law that the record does not contain clear and convincing evidence that Seligson or his employer prepared the loudspeaker article with knowledge that it contained a false statement, or with reckless disregard of the truth.

It may well be that in this case, the "finding" of the District Court on the actual-malice question could have been set aside under the clearly-erroneous standard of review, and we share the concern of the Court of Appeals that the statements at issue tread the line between fact and opinion.  Moreover, the analysis of the central legal question before us may seem out of place in a case involving a dispute about the sound quality of a loudspeaker.  But though the question presented reaches us on a somewhat peculiar wavelength, we reaffirm the principle of independent appellate review that we have applied uncounted times before.  We hold that the clearly-erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times Co.* v. *Sullivan.*[31]  Appellate judges in such a case must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[31] There are, of course, many findings of fact in a defamation case that are irrelevant to the constitutional standard of *New York Times Co.* v. *Sullivan* and to which the clearly-erroneous standard of Rule 52(a) is fully applicable.  Indeed, it is not actually necessary to review the "entire" record to fulfill the function of independent appellate review on the actual-malice question; rather, only those portions of the record which relate to the actual-malice determination must be independently assessed.  The independent review function is not equivalent to a *"de novo"* review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff.  If the reviewing Court determines that actual malice has been established with convincing clarity, the judgment of the trial court may only be reversed on the ground of some other error of law or clearly erroneous finding of fact.  Although the Court of Appeals stated that it must perform a *de novo* review, it is plain that the Court of Appeals did not overturn any factual finding to which Rule 52(a) would be applicable, but instead engaged in an independent assessment only of the evidence germane to the actual-malice determination.

THE CHIEF JUSTICE concurs in the judgment.

JUSTICE WHITE, dissenting.

Although I do not believe that the "reckless disregard" component of the *New York Times* malice standard is a question of historical fact, I agree with JUSTICE REHNQUIST that the actual-knowledge component surely is. Here, the District Court found that the defamatory statement was written with actual knowledge of falsity. The Court of Appeals thus erred in basing its disagreement with the District Court on its *de novo* review of the record. The majority is today equally in error. I would remand to the Court of Appeals so that it may perform its task under the proper standard.

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, dissenting.

There is more than one irony in this "Case of the Wandering Instruments," which subject matter makes it sound more like a candidate for inclusion in the "Adventures of Sherlock Holmes" than in a casebook on constitutional law. It is ironic in the first place that a constitutional principle which originated in *New York Times Co. v. Sullivan*, 376 U. S. 254 (1964), because of the need for freedom to criticize the conduct of public officials is applied here to a magazine's false statements about a commercial loudspeaker system.

It is also ironic that, in the interest of protecting the First Amendment, the Court rejects the "clearly erroneous" standard of review mandated by Federal Rule of Civil Procedure 52(a) in favor of a *"de novo"* standard of review for the "constitutional facts" surrounding the "actual malice" determination. But the facts dispositive of that determination—actual knowledge or subjective reckless disregard for truth—involve no more than findings about the *mens rea* of an author, findings which appellate courts are simply ill-prepared to make in any context, including the First Amendment context. Unless "actual malice" now means something different from the definition given to the term 20 years ago by this

Court in *New York Times,* I do not think that the constitutional requirement of "actual malice" properly can bring into play any standard of factual review other than the "clearly erroneous" standard.

In this case the District Court concluded by what it found to be clear and convincing evidence that respondent's engineer Arnold Seligson had written the defamatory statement about Bose's product with actual knowledge that it was false. It reached that conclusion expressly relying on its determination about the credibility of Seligson's testimony. 508 F. Supp. 1249, 1276–1277 (1981). On appeal there was no issue as to whether the District Court had properly understood what findings were legally sufficient to establish "actual malice" nor was there any issue as to the necessary quantum of proof nor the proper allocation of the burden of proof of "actual malice." The issue on appeal thus was only the propriety of the District Court's factual conclusion that Bose had actually proved "actual malice" in this case. Yet the Court of Appeals never rebutted the District Court's conclusion that Seligson had actual knowledge that what he printed was false. Instead it concluded after *de novo* review that Seligson's language was merely "imprecise" and that as such, it would not "support an inference of actual malice." 692 F. 2d 189, 197 (1982).

It is unclear to me just what that determination by the Court of Appeals has to do with the *mens rea* conclusion necessary to the finding of "actual malice" and with the District Court's finding of actual knowledge here. In approving the Court of Appeals' *de novo* judgment on the "actual malice" question, for all the factual detail and rehearsal of testimony with which the majority's opinion is adorned, the Court never quite comes to grips with what factual finding it must focus on. At one point we are told that "[t]he statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies," *ante,* at 513, suggesting that the disparaging

statement was perhaps not even false, or at any rate not false *enough*. One paragraph later, we are told that "as a matter of law . . . the record does not contain clear and convincing evidence that Seligson or his employer prepared the loudspeaker article with knowledge that it contained a false statement, or with reckless disregard of the truth." *Ante*, at 513. The Court remarks that the question presented "reaches us on a somewhat peculiar wavelength," *ante*, at 514, but that is scarcely a reason for transmitting the answer on an equally peculiar wavelength.

In my view the problem results from the Court's attempt to treat what is here, and in other contexts always has been, a pure question of fact, as something more than a fact—a so-called "constitutional fact." The Court correctly points out that independent appellate review of facts underlying constitutional claims has been sanctioned by previous decisions of this Court where "a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts." *Fiske v. Kansas*, 274 U. S. 380, 385–386 (1927). But in other contexts we have always felt perfectly at ease leaving state-of-mind determinations, such as the actual knowledge and recklessness determinations involved here, to triers of fact with only deferential appellate review— for example, in criminal cases where the burden of proving those facts is even greater than the "clear and convincing" standard applicable under *New York Times*.[1]

---

[1] In attempting to justify independent appellate review of the "actual malice" determination, the majority draws an analogy to other cases which have attempted to define categories of unprotected speech, such as obscenity and child pornography cases, *New York v. Ferber*, 458 U. S. 747, 774, n. 28 (1982); *Miller v. California*, 413 U. S. 15 (1973); *Roth v. United States*, 354 U. S. 476 (1957), and cases involving words inciting anger or violence, *Hess v. Indiana*, 414 U. S. 105 (1973) *(per curiam); Street v. New York*, 394 U. S. 576 (1969); *Chaplinsky v. New Hampshire*, 315 U. S. 568 (1942). To my mind, however, those cases more clearly involve the kind of

Presumably any doctrine of "independent review" of facts exists, not so that an appellate court may inexorably place its thumb on the scales in favor of the party claiming the constitutional right, but so that perceived shortcomings of the trier of fact by way of bias or some other factor may be compensated for.[2] But to me, the only shortcoming here is an

mixed questions of fact and law which call for *de novo* appellate review than do the *New York Times* "actual malice" cases, which simply involve questions of pure historical fact.

For example, with respect to the obscenity cases, appellate courts perhaps are just as competent as are triers of fact to make determinations about whether material appeals to "prurient interests," whether it depicts sexual conduct in a "patently offensive" way, and whether the material lacks serious artistic value, *Miller* v. *California, supra,* at 24. In the words-inciting-violence cases, the necessary determinations, equally capable of *de novo* appellate review, are whether words are " 'likely to provoke the *average* person to retaliation,' " *Street* v. *New York, supra,* at 592 (emphasis added) (quoting *Chaplinsky* v. *New Hampshire, supra,* at 574), or whether the "rational inference from the import of the language" is that it is "likely to produce *imminent* disorder." *Hess* v. *Indiana, supra,* at 109. None of those cases requires the kind of pure historical factual determination that the *New York Times* cases require: a determination as to the actual subjective state of mind of a *particular* person at a *particular* time.

[2] The Court correctly points out that in *New York Times Co.* v. *Sullivan,* we conducted independent appellate review of the facts underlying the "actual malice" determination. It is notable, however, that *New York Times* came to this Court from a state court after a jury trial, and thus presented the strongest case for independent factfinding by this Court. The factfinding process engaged in by a jury rendering a general verdict is much less evident to the naked eye and thus more suspect than the factfinding process engaged in by a trial judge who makes written findings as here. Justifying independent review of facts found by a jury is easier because of the absence of a distinct "yes" or "no" in a general jury verdict as to a particular factual inquiry and because of the extremely narrow latitude allowed appellate courts to review facts found by a jury at common law. Thus it is not surprising to me that early cases espousing the notion of independent appellate review of "constitutional facts," such as *Fiske* v. *Kansas,* 274 U. S. 380 (1927), and *New York Times,* should have arisen out of the context of jury verdicts and that they then were perhaps only reflexively applied in other quite different contexts without further analysis. See *Time, Inc.* v. *Pape,* 401 U. S. 279 (1971) (involving appellate review of a District Court's directed verdict).

appellate court's inability to make the determination which the Court mandates today—the *de novo* determination about the state of mind of a particular author at a particular time. Although there well may be cases where the "actual malice" determination can be made on the basis of objectively reviewable facts in the record, it seems to me that just as often it is made, as here, on the basis of an evaluation of the credibility of the testimony of the author of the defamatory statement. I am at a loss to see how appellate courts can even begin to make such determinations. In any event, surely such determinations are best left to the trial judge.

It is of course true as the Court recognizes that "where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized." *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958). But the *New York Times* rule adequately addresses the need to shield protected speech from the risk of erroneous factfinding by placing the burden of proving "actual malice" on the party seeking to penalize expression. I agree with Justice Harlan who, in commenting on the inappropriateness of *de novo* fact review of the "actual malice" determination, concluded that he could not

> "discern in those First Amendment considerations that led us to restrict the States' powers to regulate defamation of public officials any additional interest that is not served by the actual-malice rule of *New York Times, supra*, but is substantially promoted by utilizing [an appellate court] as the ultimate arbiter of factual disputes in those libel cases where no unusual factors, such as allegations of harassment or the existence of a jury verdict resting on erroneous instructions . . . are present." *Time, Inc.* v. *Pape*, 401 U. S. 279, 294 (1971) (dissenting opinion).

I think that the issues of "falsity" and "actual malice" in this case may be close questions, but I am convinced that the

District Court, which heard the principal witness for the respondent testify for almost six days during the trial, fully understood both the applicable law and its role as a finder of fact. Because it is not clear to me that the *de novo* findings of appellate courts, with only bare records before them, are likely to be any more reliable than the findings reached by trial judges, I cannot join the majority's sanctioning of factual second-guessing by appellate courts. I believe that the primary result of the Court's holding today will not be greater protection for First Amendment values, but rather only lessened confidence in the judgments of lower courts and more entirely factbound appeals.

I continue to adhere to the view expressed in *Pullman-Standard v. Swint,* 456 U. S. 273, 287 (1982), that Rule 52(a) "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous." There is no reason to depart from that rule here, and I would therefore reverse and remand this case to the Court of Appeals so that it may apply the "clearly erroneous" standard of review to the factual findings of the District Court.