652 So.2d 490 (1995)
Diran M. SEROPIAN, M.D., Appellant,
v.
Hamilton C. FORMAN, Appellee.
No. 93-0146.
District Court of Appeal of Florida, Fourth District.
March 29, 1995.
*491 Ray Ferrero, Jr. of Ferrero & Middlebrooks, P.A., Fort Lauderdale, Ricki L. Tannen of Klein & Tannen, Hollywood, and John Beranek of Macfarlane Ausley Ferguson & McMullen, Tallahassee, for appellant.
Karen Coolman Amlong and William R. Amlong of Amlong & Amlong, P.A., Fort Lauderdale, and Arthur J. England, Jr., and Elliot H. Scherker of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, for appellee.
FARMER, Judge.
In this defamation case, the trial court separated the issues of liability and damages for trial. A jury verdict determined the liability issue in favor of the plaintiff. The defendant argues on appeal from that verdict that the publications in suit did not defame this public official plaintiff, that they were not false, and that they were privileged. We have jurisdiction of this non-final appeal. We reverse and remand for the entry of judgment in favor of defendant.
This case emerged from a storm of controversy in Broward County over whether a nationally known, out-of-state, medical clinic could open a new hospital near Fort Lauderdale. Apparently, a large number of the physicians on the staff of some of the county's leading public hospitals greeted the entry of the Cleveland Clinic [Clinic] into their market with immense disfavor. When the Clinic applied to the State Department of Health and Rehabilitative Services [HRS] for a certificate of need [CON] to operate a 400-bed hospital in the area, the wisdom of opening the doors to this new provider of health care competition became the subject of a public debate.
Unquestionably, that debate took place in a public forum in the context of a statutorily formalized, political administrative process. It was then, and is now, illegal to open and operate a hospital in Florida without a license from the State Department of Health and Rehabilitative Services [HRS]. See § 395.003(1)(a), Fla. Stat. (1987). State law also bars the issuance of a license for the operation of any specified health care facility, which by definition includes hospitals, unless the provider or facility first obtains a "certificate of need" [CON]. § 381.704(2), Fla. Stat. (1987). The CON is a formal written declaration by HRS "evidencing community need for a new, converted, expanded, or otherwise significantly modified health care facility." § 381.702(2), Fla. Stat. (1987).
Briefly summarized, a formal application for a CON is filed with HRS. § 381.709(3), Fla. Stat. (1987). After notice of the filing is published, HRS may hold a public hearing if "issues of great local interest are involved." § 381.709(3)(b), Fla. Stat. (1987). The matter then proceeds as a formal proceeding. See § 120.57, Fla. Stat. (1987). At the conclusion of the formal proceeding, the hearing officer issues a recommended order. § 381.709(5)(b), Fla. Stat. (1987). In the end, HRS makes the final decision. § 381.709(5)(c), Fla. Stat. (1987). Its decision may be reviewed in the district court of appeal under section 120.68 for compliance with the statutory scheme.
It was during this administrative process that defendant published the statements in suit. These publications were made in response to a letter that plaintiff himself had previously written in early January 1988 to *492 an HRS hearing officer about the Clinic's pending CON application. Plaintiff was then the Chairman of the Board of Commissioners of the North Broward Hospital District [District], a special taxing district that owns and operates several public hospitals in Broward County.[1] Plaintiff's letter to HRS was written on the stationery of the District and was expressly signed by him in his capacity as Chairman of the Board. The stationery used by plaintiff is embossed with the seal of the District, and the words "North Broward Hospital District" appear at the top of the paper. The letterhead lists the names of all District Commissioners, including plaintiff's, and plaintiff is also designated as the Chairman.
In his letter to the HRS hearing officer, plaintiff urged that the Clinic's pending application for a CON be granted. Plaintiff's letter contains, among others, the following statements:
"It is respectfully requested that you consider this information and take it into consideration as you make a decision on this vitally important C.O.N. to the North Broward Hospital District and Broward County and its taxpayers and patients."
"I was born in Fort Lauderdale, Florida, and have been a viable part of Broward County for over 50 years and a Commissioner of the North Broward Hospital District for over 24 years, presently serving as Chairman of the Board."
"The North Broward Hospital District owns and operates four hospitals and medical centers in the Cleveland Clinic C.O.N. catchment [sic] area. * * * We are the largest supplier of acute hospital care in the area. In addition, we provide approximately 95% of all indigent hospital care for the residents and taxpayers of our District."
"The Cleveland Clinic is going to utilize the facilities of the North Broward Hospital District well into 1992." "During this same period, their physicians, as members of our medical staff, will also be taking care of our indigent population."
"It is a fact that no one has ever done more or provided the leadership, time and energies that I have spent aggressively protecting, supporting and expanding the medical care provided the residents and taxpayers of Broward County by the hospitals of the North Broward Hospital District."
"The district needs the Cleveland Clinic and their physicians using our facilities for the next 4 1/2-5 years. As a large taxpayer, concerned citizen and as Chairman of the North Broward Hospital District Board of Commissioners, I support and urge that you grant [e.o.] the Cleveland Clinic C.O.N. application."
[All emphasis added unless otherwise indicated.] A copy of the entire letter is included in the appendix.
Defendant is a medical doctor and was during the time in question the Chief of Staff at Broward General Medical Center. In response to plaintiff's single letter, defendant wrote the three letters in question, all at the same time. The first was directed to the same HRS hearing officer and referenced the pending CON application; the second was to his fellow staff physicians at Broward General Medical Center; and the third letter was directed to plaintiff. We reprint them in an appendix to this opinion.
Defendant's third letter was addressed only to plaintiff, but it was also sent to all (400 +) staff physicians, the other district commissioners, and the recipients of plaintiff's letter. It is fair to say that plaintiff's principal claim of defamation lies in the following paragraph from the third letter, especially the highlighted text:
"I invite each of you to embrace your identity and to support an action which will be a lesson in Civics and Political Science for all of us: to set forth the proposition that politics and politicians can and ought to be about more than influence peddling and the abuse of power; that it can, in *493 fact, represent the enlightened and courageous administration of the laws and policies that are the product of our democratic processes. No action on your part could conceivably be more important to the survival of any kind of meaningful trust in the relationship between the physicians, administration and commissioners of the North Broward Hospital District family." [e.s.]
To be sure, plaintiff argues that other parts of the three letters constitute or contribute to other defamatory falsehoods, in particular the multiple use of the words "fraud and deceit", as well as "data [are] fantastical", "public relations fabrications", the "arrogant and contemptuous way in which [plaintiff's] letter was sent", and that plaintiff's letter was "deceptive." It is clear, however, from context that none of these other statements are sufficient to support a claim of defamatory falsehood by a public official in that they are clearly labeled opinions with statements of undisputed facts to support them, and that none of them was supported by proof of actual malice, i.e. knowing falsity or reckless disregard of whether they were true or false. We therefore concentrate our attention on the sole remaining statement, "influence peddling."
During the trial, plaintiff's lawyer read the jury an answer to an interrogatory given by defendant in which he had stated his definition of influence peddling. In this interrogatory answer, defendant stated that the term influence peddling meant "efforts to cause legislative or political transactions in return for favors, indebtedness, monies or real or imagined advantages." Plaintiff then used large billboards during trial containing this definition of influence peddling. Indeed at one point during the trial, plaintiff's lawyer unequivocally stated: "[t]his whole case is about influence peddling." In short, the gist of plaintiff's defamatory falsehood claim is that defendant accused him of influence peddling.
Our society prizes the dignity of each individual person and thus permits an action for damages against the publisher of defamatory falsehood. Art. I, § 4, Fla. Const. ("Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right." [e.s.]); Miami Herald Publishing Co. v. Ane, 458 So.2d 239 (Fla. 1984). Justice Stewart described the importance of the value we place on one's good name thus:
"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being  a concept at the root of any decent system of ordered liberty."
Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966). At the same time, however, as article I, section 4 of our state Constitution shows, we broadly permit freedom of speech  including the right to attack the ideas propounded by another person in a political or public debate. Quite apart from our own state constitution, moreover, freedom of speech is among the first of our national rights. U.S. Const. amend. I ("Congress shall make no law * * * abridging the freedom of speech * * *."). The intrinsic tension between the right to sue for defamatory falsehood and the right to publish one's own views marks one of the most exquisitely sensitive decisions a court can make.
So great is the protection given to writers and speakers under the First Amendment that the Supreme Court has held that a public official, such as the plaintiff in this case,[2] can make out a good claim of damages for defamatory falsehood only where the official can show that the writer published a defamatory falsehood with knowledge that it was false, or with reckless disregard as to whether it was true or false. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Stated differently, the burden is to show that the writer *494 deliberately lied and falsified something or, as an alternative to a knowing lie, that the writer of a defamatory falsehood "in fact entertained serious doubts as to the truth of his publication," St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), or that he acted with a "high degree of awareness of * * * probable falsity," Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Moreover, the official must prove the essential fact, not with the ordinary evidentiary burden of most civil cases, called the "greater weight" of the evidence in Florida, but instead with a higher, more demanding, burden called "clear and convincing" evidence. Id.
In Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual," 418 U.S. at 347, 94 S.Ct. at 3010, but that the states could not permit recovery of presumed or punitive damages on anything less exacting than the "actual malice" standard of New York Times. Thus, in Florida a private individual who is neither a public official nor a public figure need establish only that the publisher of a defamatory falsehood was negligent to recover proven compensatory damages. Miami Herald Publishing Co. v. Ane, 458 So.2d 239 (Fla. 1984). In Philadelphia Newspapers Inc. v. Hepps, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Court further held that "the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern."[3] 475 U.S. at 777, 106 S.Ct. at 1564.
Then, to insure that the factfinder has not been swayed by some hidden but imperceptible considerations, the scope of review on appeal is highly unusual and essentially does away with the notion that the appellate court will defer to the factfinder's application of law to facts. In cases involving an alleged defamatory falsehood about a public official, an appellate court is required to conduct its own independent review of the evidence and determine for itself whether the evidence is sufficient to meet the exacting requirements of the First Amendment. Harte-Hanks Communications Inc. v. Connaughton, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). As the Supreme Court said in Bose Corp. v. Consumers Union of United States Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984):
"[j]udges, as expositors of the Constitution * * * have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice."
466 U.S. at 511, 104 S.Ct. at 1965; see also Harte-Hanks, 491 U.S. at 686, 109 S.Ct. at 2695. This unusual standard of appellate review does not necessarily mean that appellate judges can resolve factual disputes in the evidence to their own satisfaction and thereby ignore that traditional function of the jury. As Justice Scalia noted in his concurring opinion in Harte-Hanks, the Bose holding of "independent assessment" merely means "assuming all of the facts that could be found in favor of the plaintiff were found in favor of the plaintiff, [whether] clear and convincing proof of malice was established." [e.o.] Harte-Hanks, 491 U.S. at 697, 109 S.Ct. at 2701 (Scalia, J., concurring in the judgment). Both Justices White and Kennedy pointed out, 491 U.S. at 694, 696, 109 S.Ct. at 2699, 2700, that that view was not at all inconsistent with the majority opinion of Justice Stevens, especially as shown in the following passage:
"Petitioner concedes that `when conducting the independent review mandated by New York Times and Bose, a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility.' * * * It contends, however, that this Court did reject the trial court's credibility determination in Bose. We disagree with this reading of Bose, In Bose we accepted *495 the trial court's determination that the author of the report at issue did not provide credible testimony concerning the reason for his choice of words and his understanding of the meaning of the word `about.' * * * Unlike the District Court, however, we were unwilling to infer actual malice from the finding that the witness `refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made  that the inaccurate was accurate.'"
Harte-Hanks, 491 U.S. at 689, n. 35, 109 S.Ct. at 2696, n. 35. Hence, in making our independent review of the evidence in this case, we have assumed all of the facts that could be found in favor of the plaintiff were found in favor of the plaintiff, and decided for ourselves whether those facts as found by the jury amount to clear and convincing proof of defamatory falsehood by a public official. With these principles at hand, we explain our analysis of the claims and evidence in this case.
To be sure, plaintiff has not cited a single authority holding that the term influence peddling is, under any circumstances, defamatory. Nor has our own research disclosed any reported case in which there has been an attempt to bring a defamation action based on those words. One might reasonably suppose  especially considering the profusion of federal, state and local governments in this country and the wealth of newspapers, magazines, television and radio stations, and other media reporting on the activities taking place in relation to each of these governmental entities  that if influence peddling connoted a crime there would be a reported case somewhere of such a claim reaching an appellate court in this country. Although the absence of such a reported decision is not itself dispositive, that void fortifies us in saying that we have strong doubts that the term could ever be defamatory.
In light of the facts of this case, the term influence peddling is, as a matter of law, neither defamatory nor a falsehood. Under Florida law, words are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure one in one's business or profession. Adams v. News-Journal Corp., 84 So.2d 549 (Fla. 1955). Considering everything said in all three letters, the term does not impute conduct incompatible with the proper exercise of plaintiff's office, or tend to subject him to hatred, distrust, ridicule, contempt or disgrace. Given the entire context of the administrative proceeding and all the letters, the term is not obviously directed to plaintiff  it could equally be directed to the Clinic and its lobbyists  as, indeed, defendant testified. Nor does the term have the settled opprobrious meaning that the terms "on-the-take", "corrupt politician", e.g., or their moral equivalents, might have had if they had been used instead, as plaintiff contended at trial. The setting and the thoughts expressed in the letters, taken as a whole, suggest that the granting of hospital CONs should be based entirely on the need for a new provider and the merits of any individual applicant but not on political favors or the benefits that one existing provider might derive from allowing a new provider into the market.
Plaintiff attempted to predicate his defamation claim on the contention that defendant's three letters effectually charged plaintiff with the unlawful acceptance of compensation from a third party for the performance of his public duties. In fact, plaintiff persuaded the trial judge to read section 838.016, Florida Statutes (1991), to the jury and later to instruct them based on the statute.[4] In short, plaintiff sought to build a *496 case around the concept of criminal conduct as the defamatory falsehood.
As we see it, plaintiff's claim of defamation by a false accusation of criminal conduct is much like the alleged libel in Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In that case, Bresler was a real estate developer engaged in negotiations with a local city council to obtain zoning variances, while the city was also engaged in negotiations with him over the price for the acquisition of some other land he owned. During the course of several city council meetings, which the Court described as "tumultuous", Bresler's negotiating position was characterized as "blackmail." This was reported in the defendant's newspaper. His complaint against the newspaper was premised on the contention that the word imputed to him the crime of blackmail. As the Court described the issue:
"The contention is, rather, that the speakers at the meeting, in using the word `blackmail,' and the petitioners in reporting the use of that word in the newspaper articles, were charging Bresler with the crime of blackmail, and that since the petitioners knew that Bresler had committed no such crime, they could be held liable for the knowing use of falsehood. It was upon this theory that the case was submitted to the jury, and upon this theory that the judgment was affirmed by the Maryland Court of Appeals."
398 U.S. at 14, 90 S.Ct. at 1541. Explaining why the word "blackmail" as used did not defame plaintiff, the Court said:
"It is simply impossible to believe that a reader who reached the word `blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime."
398 U.S. at 14, 90 S.Ct. at 1542.
Similarly, no reader of these letters could seriously have believed that plaintiff was being charged with receiving a bribe or "unlawful compensation" to endorse the Clinic's position. The only legally permissible view of the letters is that plaintiff was using his position as Chairman of the public hospital board to lend the additional aura of the authority of his office to his arguments for granting the Clinic's CON application. Thus, even assuming that the term influence peddler was directed to plaintiff, it could only have been reasonably understood to be "rhetorical hyperbole, a vigorous epithet," used by a doctor and chief of staff who thought those arguments "extremely unreasonable."
Quite apart from the legal construction of the term influence peddling, we can find absolutely no evidence of knowing falsity or reckless disregard of the truth. Plaintiff's own letter to the HRS hearing officer is filled with evidence of an attempt by plaintiff to influence the resolution of the issue pending before HRS. Plaintiff's letter repeatedly refers to the District's interests and his position as the Chairman of the Board. Plaintiff's letter was actually written on District stationery, whether intentionally or not, and is signed by plaintiff in his capacity as "Chairman, North Broward Hospital District." If, as the evidence conclusively shows, the District had taken no position on the Clinic's CON application and, in fact, had not even actually considered the subject, a *497 reader of plaintiff's letter might well reasonably infer that plaintiff was seeking to use his position as District Chairman to influence HRS into granting the pending application.
Turning from federal constitutional law, we conclude that plaintiff never overcame the privilege that Florida law provides to speakers and writers in disputes in the political processes:
"A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation."
Nodar v. Galbreath, 462 So.2d 803, 809 (Fla. 1984); Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 (1906). One of the recognized occasions for such a privilege involves the discussion or debate on public issues, or the "statement of a citizen to a political authority regarding matters of public concern." Nodar, 462 So.2d at 810. Moreover, where the circumstances surrounding a defamatory publication are so clear under the evidence as to be unquestionable, then the question of privilege is a question of law to be determined by the court. Nodar, 462 So.2d at 810. We find that clarity here.
Defendant was the chief of staff at the largest hospital operated by the District. A number of physicians testified that one of his duties as chief of staff was to communicate the position of the staff physicians on the Clinic CON question. In fact the staff had specifically voted and expressly directed him to do so. The offending words were communicated to persons having corresponding interests or duties, namely the HRS hearing officer, the District commissioners, staff physicians, and recipients of plaintiff's own letter. Moreover, there is no evidence of abuse of the privilege, other than the words themselves, that would tend to show any express malice in the publication. While there is evidence that defendant did not like plaintiff and harbored resentments about him, there is nothing to suggest that the publications in suit were anything other than a strong response to plaintiff's own letter. We conclude that even the evidence resolved in plaintiff's favor showed the privilege as a matter of law.
And finally, even if we were not reversing on all of the above grounds which dispose of this case once and for all, we would surely reverse for a new trial because of the testimony of an expert witness called by plaintiff and because of a jury instruction. During his case in chief, plaintiff called a political science professor to testify as an expert witness on public opinion, special taxing districts, and the political system in Florida in general. The witness testified for nearly a day and a half. His testimony-inchief included a detailed analysis of the three letters  at one point, word-by-word, line-by-line  including his opinion as to why the three letters were defamatory. He was permitted, also over objection, to testify at great length as to the meaning of common, ordinary words in defendant's three letters, and as a legal expert on whether influence peddling was a crime. This was highly prejudicial error.
Recognizing that the judge on the scene has broad discretion in allowing expert testimony and the scope of such testimony, nevertheless we also recognize that:
"Because the importance and validity of an expert witness are increased in the mind of the jury, allowing an expert witness to testify to matters of common understanding creates the possibility that the jury will forego independent analysis of the facts when it does not need assistance in making that analysis. This is particularly true when there are no unusual or complicated circumstances surrounding the incident about which the expert testifies."
Florida Power Corp. v. Barron, 481 So.2d 1309, 1310 (Fla. 2d DCA), rev. dismissed, 488 So.2d 829 (Fla. 1986). We do not consider the meaning of the words in defendant's three letters as so arcane, so beyond the ordinary understanding of the average juror, that expert testimony was obviously helpful or necessary to the finder of fact.
Moreover, even though in this case the witness was qualified as an expert on public opinion, special taxing districts and the political *498 process generally, we do not agree that he was therefore qualified to "translate"  in the same way that a linguist might do  the subject letters for the jury. Political scientists may be qualified to give opinions on how public opinion affects political processes, especially as regards special taxing districts. But nothing that is known generally about such expertise, or that the witness in this case adduced, supplied the necessary factual foundation to qualify political scientists in general or this one in particular to render an opinion on hidden defamatory meanings in common words well within ordinary understanding. If influence peddling conveyed the obloquy that plaintiff suggests, that fact should be readily understood by the ordinary jury without a political scientist swearing that it does. We find that the trial judge abused her discretion with regard to this political scientist's testimony.
An important feature of the defense was that the term influence peddling had been directed to the Cleveland Clinic lobbyists and not to plaintiff. In fact, defendant so testified. At the charge conference, defendant requested that the court give Florida Standard Jury Instruction (Civil) MI 4.1a.[5] Plaintiff objected, but not because the standard jury instruction was not a correct statement of the law. The court declined to give the standard instruction, and during the course of her instructions told the jury that one of the issues for them to resolve was:
"Whether one or more of Seropian's statements concerning Forman was in some significant respect a false statement and tended to expose Forman to hatred, ridicule, or contempt, or tended to injure Forman in his business, reputation or occupation, or charged that Forman had committed a crime." [e.s.]
The failure to tell the jury that it should decide whether any of the alleged defamatory statements actually concerned, or were about, plaintiff deprived defendant of his opportunity to have the jury decide this contested issue. Indeed  if one agrees that the statement influence peddling was defamatory under the circumstances of this case and that defendant published the statement knowing that it was false  this turns out, in our mind, to be the only real issue for the jury to determine. In no sense can this be described as harmless error.
We therefore reverse the judgment on liability for plaintiff and remand for the entry of judgment in favor of defendant that plaintiff shall take nothing by this action and that defendant shall go hence without day with his costs.
REVERSED.
KLEIN, J., concurs.
STONE, J., partially concurs and dissents with opinion.

APPENDIX

A. PLAINTIFF'S LETTER:
"Dear Ms. Gordon-Girvin:
"On The Hearing date, December 30, 1987, I was in Kitzbuhel, Austria, with my wife, Doris; my son, Austin; and his wife, Katie. It was impossible to change the plans and reservations which were made in July, 1987. It was my desire to come to the hearing and make a presentation supporting the Cleveland Clinic C.O.N.
"Since it was not possible for me to appear at the hearing, I am today filing with my support and certain backup data for the Cleveland Clinic C.O.N. and my reasons for so doing. It is respectfully requested that you consider this information and take it into consideration as you make a decision on this vitally important C.O.N. to the North Broward Hospital District and Broward County and its taxpayers and patients.
"Since you do not know me, please let me introduce myself; my name is Hamilton C. Forman. I reside at 1524 Coral Ridge Drive, Fort Lauderdale, Florida, 33304. I was born in Fort Lauderdale, Florida, and have been a viable part of Broward County for over 50 years and a Commissioner of *499 the North Broward Hospital District for over 24 years, presently serving as Chairman of the Board.
"The North Broward Hospital District owns and operates four hospitals and medical centers in the Cleveland Clinic C.O.N. catchment [sic] area. They are Broward General Medical Center, North Broward Medical Center, Imperial Point Medical Center and Coral Springs Medical Center. We are the largest supplier of acute hospital care in the area. In addition, we provide approximately 95% of all indigent hospital care for the residents and taxpayers of our District.
"It is my understanding that there has been some concern that the granting of the Cleveland Clinic C.O.N. would impact negatively on the finances of the North Broward Hospital District. Nothing could be further from the truth. The Cleveland Clinic is going to utilize the facilities of the North Broward Hospital District well into 1992. The patients they will bring and their utilization of Broward General Medical Center will add many millions of dollars of profits each year to our bottom line (see enclosed schedules).
"During this same period, their physicians, as members of our medical staff, will also be taking care of our indigent population. They will also bring cardiovascular pediatric surgery to the district. You probably are not aware that several years ago a kidney transplant program was instituted at Broward General Medical Center together with a complete dialysis treatments. In cooperation with the Cleveland Clinic, our kidney transplant program will be reactivated.
"From a practical standpoint, the granting of the Cleveland Clinic C.O.N. for additional hospital beds in Broward County will have little or no appreciable effects on the existing beds. Only a small part of Cleveland Clinic's patients will come from Broward County  most of these would go elsewhere for their surgery. The rest of Cleveland Clinic's patients will come from out of the area: other states, the Islands of the Caribbean, Central and South America.
"Not only is this so, but they will have many patients from elsewhere who do not need Cleveland Clinic's specialty care and who will end up having their hospital and medical needs supplied by the other area hospitals.
"It is a fact that no one has ever done more or provided the leadership, time and energies that I have spent aggressively protecting, supporting and expanding the medical care provided the residents and taxpayers of Broward County by the hospitals of the North Broward Hospital District.
"The Cleveland Clinic hospital beds will not come on line until the middle of 1992. During this time, the county's resident population will be increased between 200-300 thousand new residents.
"The direct needs the Cleveland Clinic and their physicians using our facilities for the next 4 1/2-5 years. As a large taxpayer, concerned citizen and as Chairman of the North Broward Hospital District Board of Commissioners, I support and urge that you grant the Cleveland Clinic C.O.N. application.
"Please grant the Cleveland Clinic C.O.N. application. In so doing, you will perform a real service to both our community and the North Broward Hospital District. I know you will be glad you did.
"Thank you,
"Hamilton C. Forman, Chairman
"North Broward Hospital District"

B. DEFENDANT'S THREE LETTERS:
1. The first letter was addressed to the hearing officer in the administrative proceeding before HRS. It read:
"Dear Ms. Gordon-Girvin:
"Apropos of our telephone conversation of the 15th of January, 1988, concerning a letter received by your offices from the North Broward Hospital District, signed by its Chairman, Hamilton C. Forman, I would like to inform you of the great concern the staff of the Broward General Medical Center has as to your interpretation *500 of the letter as Administrator of the Office of the Community Medical Facilities.
"First, insofar as the letter was written on the North Broward Hospital District letterhead, and has inscribed at its head the names of the following Commissioners, F.A. Mapleton, David I. Yorra, A.D. `Becky' Gerren, Steven I Josias, Amos S. Bonner, and Frank Childers in addition to the name of Hamilton C. Forman, and insofar as the letter suggests by inference, at least, that it represents the views of the majority of those Commissioners, the letter is a fraud and a deceit. In fact, prior to having written the letter in question, Mr. Forman had every reason to know that the majority of the Commissioners of the North Broward Hospital District were not in agreement with the substance of his letter."
"Furthermore, as you the recipient of the letter confirmed verbally in our telephone conversation, you assumed that the North Broward Hospital District, being a creature of the Florida Legislature, and an extension of the Sovereign, is obliged by the Florida Statute to operate in the `Sunshine'. Since you chair an office that is also a child of the Florida Legislature, you assumed that the substance of the letter supporting the C.O.N. application for the Cleveland Clinic had been the result of an agenda item of either a regular or special meeting of the North Broward Hospital District Commissioners, and further, that during such a meeting, appropriate discussion and debate had taken place, that a resolution had been passed by the Commissioners following a vote concerning the debate which directed the writer of the letter, the Chairman, Hamilton C. Forman, to author the letter of January 7, 1988. That would be your interpretation of such a letter. To the extent that no such agenda item was ever discussed in either a regular or special meeting of the North Broward Hospital District, that no such discussion ever took place, no vote took place authorizing or directing the Chairman, or any member of the North Broward Hospital District Commissioners to write such a letter to your offices, the letter is a fraud and a deceit.
"For this reason, I feel that it is important in your appraisal of the application, and particularly the letter in question, to understand how strongly we feel in regard to the fact of the letter itself.
"As to the content of the letter, I am aware that your offices are no longer accepting opinions or comments in regard to the validity of a C.O.N. application for the Cleveland Clinic, but I feel it is important to point out that in that letter, most of the data presented by Mr. Forman is fantastical, and almost all of it is lifted directly from the well financed public relations fabrications representing the interests of the Cleveland Clinic.
"I trust that this information will be of use to you. I would like to inform you that the Medical Council of the Broward General Medical Center has called for a special meeting of the North Broward Hospital District Commissioners to place into a single-item-agenda meeting the question of the propriety and the validity of sending the letter in question to your offices." [e.o.]
2. The second letter was directed to his fellow physicians at Broward General Medical Center and said:
"My dear Colleague:
"Enclosed you will find certain letters and material regarding what I consider to be a very emergent situation that requires your attention and support.
"As Chief of Staff of the Broward Medical Center, I can look back at hundreds of hours of meetings and discussions with your representatives and your other colleagues at various levels, committee as well as the Medical Council. We have not always been able to get what we as physicians have wanted in the way of support from our Administrators, and we've had to make certain compromises with the Commissioners of the North Broward Hospital District and with the Administrators of the Broward General Medical Center as well as the other hospitals of the North Broward Hospital District. But, in spite of *501 that, I believed that some very real strides had been made in the beginning synthesis of an alliance between the Administrators, the Commission and physicians in resolving our differences, as well as continuing to deliver health care of the highest standards of excellence for this community. Unfortunately, as you can deduce from the letters that we have included for your perusal, unless the members of the Board of Commissioners are prepared to respond vigorously to the usurpation of their authority and power by their Chairman, and clearly disavow that behavior, I believe that we will have to take further steps to evaluate our entire relationship. In this regard, I invite any and all of you to make recommendations or suggestions to consider the matter that is set forth here.
"Although your Medical Council has acted in response to Mr. Forman's letter, as you have been informed by the enclosed letter to the Commissioners, I intend to call an emergency meeting of the General Staff of the Broward General Medical Center in order to allow for open discussion and debate, and to hear recommendations from staff members as to how to deal with this particular situation. We hope that we will be able to resolve this matter in a way that is good for medicine and our patients' welfare in our county."
3. Defendant's third letter was addressed to plaintiff and said:
"Dear Mr. Forman:
"This letter is to inform you that the Medical Council of the staff of Broward General Medical Center met on Tuesday, January 19, 1988 and upon discussion of a letter written by Mr. Hamilton Forman on the North Broward Hospital District stationary [sic] and signed by him over his designated position as Chairman, written on January 7, 1988 to Ms. Sharon Gordon-Girvin, Administrator of the Office of the Community Medical Facilities, voted unanimously to request the members of the North Broward Hospital District to call a special meeting for purposes of discussing the letter in question. According to Article II, Section 3-17 of the North Broward Hospital District Code, `A special meeting of the Board of Commissioners may be called by the Chairman or by three members of the Board, and that written notice shall be given to each member stating the purpose of the meeting and its time and place at least two days prior to the meeting.'
"For those of you who have not seen the letter in question, I enclose a copy for your examination.
"I have included in this mailing a copy of the letter that I, as Chief of Staff of Broward General Medical Center wrote to the Administrator of the Office of the Community Medical Facilities in Tallahassee, Florida setting forth the nature of our concern.
"As a member of the medical community of Fort Lauderdale and as a staff member of Broward General Medical Center for almost thirty years, I have observed in recent years and, as Chief of Staff, that the physician staffs of the District hospitals, the Administrators and their staffs of those hospitals, and the Commissioners of the North Broward Hospital District could forge a viable and productive alliance directed at strengthening and monitoring the very fine system of health care delivery to the citizens of this county. Occasionally, we have, in the past, had our relations marred by adversarial situations and a polarization that has not always served our mutual interests well, nor those of our citizens.
"Recently, however, many of us have perceived that we were at the point of cementing an alliance which would be based on mutual respect and the awareness that we all had a common goal and purpose.
"Unfortunately, the letter that was written and mailed on the North Broward Hospital District letterhead with the names of all the Commissioners at the head of the letterhead, signed by Mr. Forman, reduces the chances for such a synthesis almost completely. The credibility of the District Commission is so impaired by the substance of the letter in question, as well as the arrogant and contemptuous way in which it was sent to the Administrator of the Office of Community Medical Facilities *502 in Tallahassee, that I believe that a special meeting of the North Broward Hospital District to deal with this issue is mandatory. Furthermore, if the physicians in this community and the administrators and their staff of the hospitals of the District are ever again to trust the good will and the integrity of the Commissioners of the North Broward Hospital District, I believe that is necessary for you to join with the other Commissioners to disavow and repudiate the substance and the manner in which this deceptive letter was sent to an agency of the State of Florida.
"I invite each of you to embrace your identity and to support an action which will be a lesson in Civics and Political Science for all of us: to set forth the proposition that politics and politicians can and ought to be about more than influence peddling and the abuse of power; that it can, in fact, represent the enlightened and courageous administration of the laws and policies that are the product of our democratic processes. No action on your part could conceivably be more important to the survival of any kind of meaningful trust in the relationship between the physicians, administration and commissioners of the North Broward Hospital District family. "The rules for such proceedings are set forth in Chapter 3, Article II, Section 3 of the Code of the North Broward Hospital District, as well as Robert's Rules of Order.
"I urge you to consider the election of a new chairman as an appropriate response in this matter. It is, of course, unfortunate that this confrontation and this issue should arise at all, but I can state for the physicians of our staff, that we believe that our relationship with the Commission can survive in a healthy manner, if the members of the Commission respond to the improper usurpation of the authority of all Commission members."
STONE, Judge, concurring in part and dissenting in part.
I cannot conclude that an accusation of influence peddling is neither false nor defamatory as a matter of law in this factual context. To the contrary, a reasonable trier of fact could decide that a charge of improper peddling of influence had been directed at Plaintiff by Defendant and that such accusation included an innuendo of corrupt conduct and misuse of office, which can constitute a criminal act and subject Plaintiff to public scorn, distrust, and disgrace. Although some might not consider this terminology seriously opprobrious; others would, including the trial court and unanimous jury here. Accusing a government official of influence peddling is arguably the equivalent of a charge of corruption. I cannot construe such a claim as simple "rhetorical hyperbole," such as that confronted in Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). A third party might well construe the charge here as an accusation that Plaintiff's support for the clinic was a quid pro quo for some secret benefit to Plaintiff, particularly as it is coupled with charges of abuse of power and deceit. Although there may not be a reported judicial opinion holding this wording defamatory, I do note that recently the Associated Press reported that the Pretoria Police were investigating allegations against Winnie Mandela, the wife of the current South African president, of bribe-taking and "influence peddling." Winnie Mandela Investigated, Allegations of Bribe-Taking Lead to Search at Mansion, Ft. Laud. Sun Sent. March 2, 1995, at 12A.
There is no dispute that Plaintiff is influential in the community and admittedly uses that influence. However, this is not the same as "peddling" influence; i.e., for gain, favor, or to the highest bidder, etc. The coupling of the term "peddling" with the word influence has an independent significance, notwithstanding Appellee's denial of such intent. Jurors could ask why those terms would be used in conjunction, so prominently, and in the context of an accusation of abuse of power, if that was not the intended interpretation.
Here, a jury might well conclude that Defendant accused Plaintiff of acts of corruption stated as a fact, although there was admittedly no factual basis for such a conclusion. Therefore, it cannot be said that there was *503 no evidence of falsity or reckless disregard for the truth, where as here, there is simply no evidence in the record that Plaintiff made his influence available for use by, or on behalf of, others in exchange for money, favors, or improper motive. Taken alone, it is essentially irrelevant that Plaintiff may have wanted to influence an ultimate outcome favorable to the Cleveland Clinic and wished to make known the role he played in the process.
There is also some record evidence, albeit disputed, from which a jury could find malice and intentional, or reckless, disregard of facts. Granted, Defendant may have had a right, as chief of staff, to impart information in good faith to his medical constituency. However, the jury's responsibility was to consider Defendant's motivation. Here, the jury apparently concluded that Defendant did not like Plaintiff and that Defendant's conduct may have been motivated by personal animosity.
Therefore, taking the evidence most favorable to Appellee, I would dissent on the issue involving proof of defamation. Nevertheless, I do concur in reversing, because of the errors in allowing the "expert" testimony and in the jury instruction. Both involve issues central to the defense and cannot be considered harmless errors.
NOTES
[1] See Ch. 27438, Laws of Fla. (1951). Actually, the District operates four public hospitals, all in central or north Broward County. The largest of these hospitals is in Fort Lauderdale and is called "Broward General Medical Center." Defendant is, or was at pertinent times, the Chief of Staff at Broward General.
[2] Plaintiff conceded below, as he does now in this court, that he is a public official governed by the standard of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), requiring proof of actual malice. Three years after New York Times, the court applied the same standards to public figures in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
[3] Because the plaintiff in this case is a public official, he already had the burden of proving falsity, so the Hepps holding has not been implicated.
[4] Section 838.016, Florida Statutes (1993), states in pertinent part as follows:

"(1) It is unlawful for any person corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept, any pecuniary or other benefit not authorized by law, for the past, present, or future performance, nonperformance, or violation of any act or omission which the person believes to have been, or the public servant represents as having been, either within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty. Nothing herein shall be construed to preclude a public servant from accepting rewards for services performed in apprehending any criminal.
"(2) It is unlawful for any person corruptly to give, offer, or promise to any public servant, or, if a public servant, corruptly to request, solicit, accept, or agree to accept, any pecuniary or other benefit not authorized by law for the past, present, or future exertion of any influence upon or with any other public servant regarding any act or omission which the person believes to have been, or which is represented to him as having been, either within the official discretion of the other public servant, in violation of a public duty, or in performance of a public duty."
[5] Fla.Std.Jury Instr. (Civil) MI 4.1a reads as follows: "Issue whether publication concerning claimant was made as claimed: Whether (defendant) [made] [published] the statement concerning (claimant) as (claimant) contends: * * *." [e.o.]