T.C. Memo. 2002-90


UNITED STATES TAX COURT


WILLIAM L. RICHTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19912-98.                    Filed April 5, 2002.


<u>Paul J. Sulla, Jr.</u>, for petitioner.

<u>Jonathan J. Ono</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


MARVEL, <u>Judge</u>:  Respondent determined a deficiency in
petitioner's 1995 Federal income tax of $513.  The sole issue for
consideration is whether petitioner is entitled to claim an
energy tax credit in 1995 of $513.

FINDINGS OF FACT

The parties have stipulated some of the facts. The stipulation of facts is incorporated by this reference. Petitioner resided in Kaneohe, Hawaii, at the time the petition was filed.

Solar Water Heating System

In or about 1994, petitioner investigated new water heating systems in conjunction with remodeling his home. As part of his investigation, petitioner authorized Joseph Miskowiec, a salesman for Mercury Solar, an organization engaged in the sale of solar energy heating systems, to conduct an energy audit of petitioner's home. The purpose of the energy audit was to ascertain the amount of energy used in petitioner's home, thereby enabling Mr. Miskowiec to analyze whether petitioner should install a solar water heating system in his home. Mr. Miskowiec determined that petitioner's hot water needs could be served by a solar water heating system that would reduce petitioner's total monthly utility costs. Mr. Miskowiec ultimately recommended that petitioner install a solar water heating system consisting of a 50-gallon storage tank, a 4- by 10-foot solar collector, a heater, a pump, plumbing, controls, and sensors (collectively, the heating system).

As part of his presentation to petitioner, Mr. Miskowiec offered petitioner two options--the option to purchase the

heating system outright and the option to purchase only the energy generated by the heating system. If petitioner chose to purchase the heating system outright, Mercury Solar would require payment in full for the installed heating system, and petitioner would be responsible for all repairs beyond the company contract. If petitioner chose to purchase only the energy generated by the heating system, Mercury Solar would sell the heating system to an environmental group which, in turn, would sell the energy to petitioner in exchange for his monthly payments. This option would provide petitioner with a longer warranty and service period than an outright purchase would provide. After reviewing his options, petitioner, in November 1995, opted to purchase only the energy generated by the heating system because of the low cost and the warranty with service.

After petitioner decided to enter into an energy purchase agreement, Mr. Miskowiec drafted a proposal, dated November 2, 1995, for petitioner's heating system, and he submitted the proposal to Mercury Solar and to Hawaii Environmental Holdings (HEH), an environmental group, for their review. The proposal indicated that HEH's total investment would be $5,131 and that its total direct cost would be $2,218. The proposal also referenced a Federal tax credit of $513, a State tax credit of $1,750, and an unexplained amount of $650 labeled "H.E.H". Both Mercury Solar and HEH accepted the proposal.

To implement the proposal, the following documents were prepared:

1.  A Solar Energy Purchase Agreement (the purchase agreement), dated November 2, 1995, by and between HEH as seller and petitioner as purchaser, in which HEH agreed to sell to petitioner all of the energy produced from the heating system. Under the purchase agreement, HEH retained ownership of the heating system and agreed to sell energy from the heating system to petitioner and to install, service, maintain, and repair the heating system during the purchase agreement's term.  HEH also agreed to make any improvements necessary to complete the installation, without any additional cost to petitioner.  HEH provided a comprehensive warranty for the term of the purchase agreement, including a promise to perform all required maintenance without additional cost to petitioner.  The payment schedule specified in the purchase agreement required petitioner to pay HEH (a) $46 per month for each of the first 36 months, except that in months 6, 12, and 36 petitioner was required to pay $2,263, $650, and $700, respectively; (b) nothing for months 37 through 60; and (c) $20 for month 61.  The payments required under the agreement totaled $5,151.  The agreement was to be in effect for a period of 5 years and 1 month from the date on which the heating system became fully operational.

2. A Metering and Solar Energy Service Guarantee in which HEH guaranteed that petitioner's fossil fuel consumption would not exceed a specified amount per year (assuming certain conditions were met) and provided a service guarantee requiring it to repair and upgrade petitioner's heating system and to take other remedial action if petitioner consumed "more fossil fuel than guaranteed".

3. An Option to Extend Term; Option to Purchase Component/s in which HEH agreed to remove its equipment at the end of the purchase agreement but provided petitioner with the option to extend his purchase agreement for an additional 61-month period (the second term) "at a reduced monthly rate of 2% of the existing contracts (sic) smaller monthly energy payment rate" (i.e., 92 cents per month). The option agreement also gave petitioner the option at the end of the second term to purchase one or more components of the solar energy collection equipment based on a price to be determined under the option agreement.

4. A Memorandum of Heated Solar Water Service Agreement & Roof Release confirming that petitioner had leased to HEH the roof of his premises "for purposes including but not limited to operating the solar water heating system."

5. A Solar Partnership Agreement (the partnership agreement) in which HEH agreed to pay petitioner $650 upon

completion of the initial term's 12th month in exchange for allowing HEH to place its equipment on petitioner's property and for petitioner's providing HEH with the names of seven referrals, writing a letter regarding his experience with the heating system, and paying all of the required payments on time.

Although some of the above-described documents do not appear to have been fully executed, both petitioner and HEH executed the purchase agreement.  Pursuant to that agreement, the heating system was installed in petitioner's home and became operational on December 7, 1995.  Although there were several instances during the initial term of the purchase agreement when the system did not work correctly, HEH arranged for the necessary repairs at no additional cost to petitioner.

As of the date of trial, petitioner had made the payments required under the purchase agreement for the initial term.  At trial, petitioner testified that he is satisfied with his heating system, which allegedly has a useful life of 15 to 20 years, and that he intends to renew his purchase agreement for a second term.

Petitioner's Relationship With HEH

HEH purports to have been created pursuant to a Contract and Declaration of Creation of Unincorporated Business Organization (the declaration).  The declaration confers upon HEH's trustees

broad powers "to do anything any citizen may do in any state or country" and "to construe the meaning and intent of this Contract and the Trustee(s)' construction shall be conclusive, legally binding and will govern."

According to certain minutes of Hawaii Environmental Holdings introduced into evidence at trial, the initial trustee, Lee Allan Hansen, served as sole trustee from June 1, 1993, until May 20, 1996. On May 21, 1996, Lee Allan Hansen appointed two additional trustees, Cynthia Kay McNeff and James Scott Sparkman (Mr. Sparkman). At the time of the trial, Mr. Sparkman claimed to be the sole trustee of HEH as well as the sole beneficiary of Mercury Solar, which he described as a business trust.[1]

HEH's minutes record that HEH's goal was to eliminate "the use of fossil fuels as an energy source for the planet as well as the state of Hawaii." The minutes also state that the trustees were to accomplish this goal through a grassroots referral-based marketing plan, sales of solar energy, and discretionary allocations of tax benefits to beneficiaries.

The partnership agreement provided, in relevant part: "By signing this document you have become a beneficiary of H.E.H. You will be given a certificate documenting this fact along with a description of your rights and privileges as a beneficiary."

_____

[1]Mr. Sparkman owned Mercury Solar until 1993. At the time of the trial, Mr. Sparkman was receiving payments from Mercury Solar as a technical assistant manager.

Mr. Sparkman testified that HEH issued to petitioner a Certificate of Evidence of Right of Distribution of Hawaii Environmental Holdings (the certificate). The certificate purported to evidence petitioner's ownership of one beneficial unit and HEH's conveyance of the right to claim a Federal investment credit for $513 and a solar energy tax credit for the State of Hawaii for $1,750. The certificate, however, was not executed by the trustee or by any other agent of HEH.

Relevant Tax Returns

For the taxable year 1995, HEH filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, which reported a net loss of $16,054. HEH attached to its 1995 return a Schedule C, Profit or Loss from Business, which reported the operating results from its sale of solar energy and showed a net profit of $30,159.

In connection with its 1995 Form 1041, HEH issued a Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, etc., to petitioner indicating that HEH had allocated $513 to petitioner as an energy credit. The Schedule K-1 did not reflect that any other item was allocable to petitioner for 1995.

In accordance with the Schedule K-1 issued to him by HEH, petitioner claimed a passthrough energy credit of $513 on Form 3468, Investment Credit, to his 1995 tax return. Petitioner also claimed a passthrough energy conservation tax credit of $1,750 on his Form N-157, Credit for Energy Conservation, included as part

of his 1995 Form N-11, State of Hawaii Individual Income Tax
Return.

Notice of Deficiency and Related Matters

On October 6, 1998, respondent issued a notice of deficiency
disallowing the Federal energy credit claimed by petitioner on
his 1995 return.  The notice described respondent's basis for the
determination as follows:

> It is determined that you are not entitled to the
> energy credits you have claimed.  It has been
> determined that you are not entitled to receive
> earnings from the trust.  Since you do not share in the
> earnings of the trust, you are not allowed to receive
> passthrough credits.  Further, it is determined that
> the energy contracts were in substance, a sale of solar
> equipment to you.  This determination would also
> prevent the passthrough of any energy credits.

Petitioner filed his petition contesting respondent's
determination on December 14, 1998.  Over a year after petitioner
filed his petition in this case, HEH arranged for the preparation
of an amended Form 1041 for 1995, on which HEH claimed total net
income of $315,870 (including net profit from its Schedule C of
$361,983), an income distribution deduction of $316,526 for
distributions allegedly made to HEH's certificate holders, and a
tentative general business credit of $111,638 consisting of a
current year investment credit of $73,552 and a credit
carryforward of $38,086.[2]  An amended Schedule K-1 was also

---

[2]Mr. Sparkman testified that HEH amended its 1995 return
(continued...)

prepared for petitioner showing an allocation to petitioner of $650 of nonpassive income and $650 of depreciation. The allocation of $650 of nonpassive income was attributable to the $650 petitioner was scheduled to receive from HEH in late 1996 pursuant to the partnership agreement.

OPINION

Prior to November 5, 1990, individual taxpayers were permitted to claim a residential energy credit against their income tax liability. Sec. 23(a)(2),[3] (b)(2), and (c)(2)(A), (5) (before its repeal by the Omnibus Budget Reconciliation Act of 1990 (OBRA), Pub. L. 101-508, sec. 11801(a)(1), 104 Stat. 1388-520). Effective November 5, 1990, OBRA sec. 11801(a)(1) repealed the residential energy credit for individuals. The energy credit, however, continued to be deductible after 1990 as part of the general business credit available to certain taxpayers, including certain trusts and estates. Sec. 38; see also sec. 50(d) (providing that, in calculating the general business credit authorized by sections 46, 48, and 50, the rules of section 48(f) relating to certain estates and trusts continue to apply).

---

[2](...continued)
because the original return reported distributions incorrectly as interest.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

As in effect for 1995, section 38(a)(2) and (b)(1) provides for a credit against a taxpayer's income tax in the amount of the investment credit determined under section 46. Section 46 provides that the amount of the investment credit, as relevant here, is the amount of the energy credit. The amount of the energy credit is equal to 10 percent of the basis of the energy property[4] placed in service during the taxable year. Sec.

_____

[4]Energy property is defined in sec. 48(a)(3) as any property--

(A) which is--

(i) equipment which uses solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, * * *

\* \* \* \* \* \* \*

(B)
(i) the construction, reconstruction, or erection of which is completed by the taxpayer, or

(ii) which is acquired by the taxpayer if the original use of such property commences with the taxpayer,

(C) with respect to which depreciation (or amortization in lieu of depreciation) is allowable, and

(D) which meets the performance and quality standards (if any) which--

(i) have been prescribed by the Secretary by regulations (after consultation with the Secretary of Energy), and

(ii) are in effect at the time of the acquisition of the property.

48(a)(1) and (a)(2)(A).  The energy property must be depreciable, which requires that the property be used in a trade or business or held for the production of income.  Secs. 48(a)(3)(A)(i), (C), 176(a).

A trust is eligible for the energy credit if it places qualifying energy property in service during the taxable year. The trust must apportion its basis in the qualifying energy property among itself and its beneficiaries.  Secs. 38(a), (c)(3)(D), 46(2), 48(a)(1).  Although there is no current provision in the Code that governs the apportionment of an investment in energy property among a trust and its beneficiaries, section 50(d)[5] refers taxpayers to specific provisions in effect prior to the enactment of OBRA.  One of those provisions, section 48(f)[6] (as in effect on the day before

_____

[5]Sec. 50(d) provides:  "For purposes of * * * [secs. 46, 48, and 50], rules similar to the rules of the following provisions (as in effect on the day before the date of the enactment of the Revenue Reconciliation Act of 1990) shall apply: * * * (6) Section 48(f) (relating to certain estates and trusts)." (Emphasis added.)

[6]Sec. 48(f) (as in effect on the day before the enactment of OBRA) provides:

> SEC. 48(f). Estates and Trusts.--In the case of an estate or trust--
>
> > (1) the qualified investment for any taxable year shall be apportioned between the * * * trust and the beneficiaries on the basis of the income of the * * * trust allocable to each, and

(continued...)

the enactment of OBRA), provides that the qualified investment must be apportioned among the trust and its beneficiaries on the basis of the trust's income allocable to each. See also sec. 1.48-6, Income Tax Regs. In enacting section 48, Congress recognized that when income is taxed in part to an organization and in part to its shareholders or beneficiaries, the investment credit is apportioned among the parties in accordance with their sharing of income for tax purposes. S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 726; H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 419.

Respondent disallowed petitioner's energy credit because he determined none of HEH's income was allocable to petitioner during 1995 and, alternatively, because the purported purchase of energy was, in substance, a sale of solar equipment to petitioner. Because we hold that petitioner has failed to prove that any of HEH's income or HEH's investment in energy property was allocable to him during 1995, we need not address respondent's second argument.

---

[6](...continued)
        (2) any beneficiary to whom any investment
    has been apportioned under paragraph (1) shall be
    treated (for purposes of * * * [secs. 46, 48, and
    50]) as the taxpayer with respect to such
    investment, and such investment shall not (by
    reason of such apportionment) lose its character
    as an investment in new section 38 property or
    used section 38 property, as the case may be.
    [Emphasis added.]

- 14 -

Tax credits are a matter of legislative grace, and petitioner bears the burden of proving his entitlement to the tax credit he claimed.[7] Rule 142(a); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934). Petitioner maintains he is eligible for the energy credit based upon his status as a beneficiary of HEH. The parties do not dispute that, if HEH placed depreciable solar energy property in service during 1995, HEH became eligible for the energy credit through its ownership of that property. Secs. 38(b)(1), 46(2). Petitioner asserts that the apportionment of part of HEH's energy credit to him was proper because HEH was required to allocate $650 of HEH's income to him under the terms of the partnership agreement and HEH actually allocated $650 of income to him for 1995, as evidenced by the amended Schedule K-1 for 1995.

While it is true that the partnership agreement reflects an obligation on the part of HEH to allocate and distribute $650 to petitioner, HEH's obligation was subject to certain conditions which required petitioner to identify several referrals, write a letter of reference, and make his energy payments on time. Moreover, under the terms of the partnership agreement, HEH was

---

[7]Sec. 7491, which is effective for Court proceedings that arise in connection with examinations commencing after July 22, 1998, places the burden on the Commissioner in certain circumstances. However, petitioner has not contended, nor is there evidence, that his examination commenced after July 22, 1998, or that sec. 7491 applies.

obligated to pay petitioner $650 only upon completion of the 12th month of petitioner's contract, if petitioner complied with his obligations.

The record indicates that petitioner did not send the required reference letter to HEH detailing his experience with the solar energy heater until November 1996. Consequently, the earliest date that HEH was obliged to allocate income to petitioner was November 1996. In addition, petitioner produced no evidence, other than the conflicting testimony of Mr. Sparkman, that the $650 was ever actually allocated or distributed to petitioner.

Similarly, the other documentary evidence petitioner produced does not adequately support his assertion that HEH actually allocated income to petitioner for 1995. Petitioner did not claim any income from HEH on his 1995 return and has not filed an amended return. Furthermore, HEH did not report any allocation or distribution of income to petitioner on its original 1995 Form 1041 or on the original 1995 Schedule K-1 issued to petitioner.

Petitioner introduced at trial what purports to be HEH's amended 1995 return and an amended 1995 Schedule K-1 as proof that HEH earned income and allocated $650 of that income to petitioner for 1995. The record does not show, however, whether HEH's amended return was actually filed. Although the amended

return claims that HEH had distributable net income and actually made income distributions of $316,526, the return was not prepared until after petitioner filed his petition in this case and is simply not probative or trustworthy.  HEH's amended return was signed by Mr. Sparkman less than 1 month prior to trial and is not corroborated by any credible evidence.  In the absence of corroborating evidence, we are not required to accept the self-serving testimony of petitioner or other interested witnesses. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984); Day v. Commissioner, 975 F.2d 534, 538 (8th Cir. 1992), affg. in part, revg. in part on another ground and remanding T.C. Memo. 1991-140; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Because we are not convinced on this record that any part of HEH's income was allocable to petitioner or that HEH allocated a portion of its investment in qualifying energy property to petitioner for 1995, we hold that petitioner is not entitled to the $513 energy credit claimed on his 1995 return.

We have carefully considered all remaining arguments made by petitioner for contrary holdings and, to the extent not discussed, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.