**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0708n.06

No. 15-5383

**FILED**
Oct 21, 2015
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CARDIOVASCULAR SUPPORT PERFUSION RELIANCE NETWORK, LLC; PERFUSION RELIANCE NETWORK, G.P.; CARDIOVASCULAR SERVICES HOLDINGS, G.P.; CARDIOVASCULAR PRODUCTS HOLDINGS, G.P.; CARDIOVASCULAR SUPPORT SERVICES, L.P.; CARDIOVASCULAR SUPPORT PRODUCTS, LTD.; CARDIOVASCULAR SUPPORT PRODUCTS, LLC; CARDIOVASCULAR SUPPORT SERVICES GP, LLC; CARDIOVASCULAR SUPPORT SOUTHWEST, LTD; MEDICAL TECHNOLOGIES, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs-Appellants,* | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| v. | ) ) ) | OPINION |
| SPECIALTYCARE, INC., d/b/a SC SpecialtyCare, Inc.; SPECIALTYCARE CARDIOVASCULAR RESOURCES, INC.; SPECIALTYCARE IOM SERVICES, LLC; SPECIALTYCARE MISS SERVICES, LLC; SPECIALTYCARE SURGICAL ASSIST, LLC, d/b/a SC SpecialtyCare Surgical Assist, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| *Defendants-Appellees.* | ) | |

**BEFORE:** BOGGS, SUTTON, and STRANCH, Circuit Judges

**JANE B. STRANCH, Circuit Judge.** This dispute arises out of an unconsummated corporate acquisition. Cardiovascular Support Perfusion Reliance Network, LLC, SpecialtyCare, Inc., and their affiliated entities are healthcare companies that provide perfusion services—

including personnel known as perfusionists who operate heart-lung bypass machines during certain surgical procedures—to hospitals in the Dallas-Fort Worth area and other regions. The companies were in talks for SpecialtyCare to acquire Cardiovascular Support, and had signed a non-disclosure agreement governing their exchange of confidential business information, when Cardiovascular Support learned that one of its longtime clients was ending their relationship and signing a contract with SpecialtyCare instead. The acquisition talks subsequently failed, and Cardiovascular Support filed suit against SpecialtyCare alleging that it violated the non-disclosure agreement and various state laws by using confidential information to win the contract with Cardiovascular Support's client. We **AFFIRM** the district court's grant of summary judgment in SpecialtyCare's favor.

## I. BACKGROUND

### A. Facts

Lloyd Yancey is a partner and part-owner of Cardiovascular Support and its affiliated entities (collectively, Cardiovascular Support), all of which are headquartered in Texas. In December of 2010, under Yancey's direction, Cardiovascular Support signed a non-disclosure agreement (NDA) with Tennessee-based SpecialtyCare, Inc. and its affiliated entities (collectively, SpecialtyCare) in connection with discussions between the companies about the potential sale of Cardiovascular Support's perfusion business. Pursuant to the NDA, Cardiovascular Support agreed to provide SpecialtyCare with access to certain confidential information on the condition that such information "be used solely for the purpose of evaluating, negotiating, and if applicable, consummating the" potential transaction between the companies. (R. 64-1, PageID 805, ¶ 2.) The parties dispute precisely what confidential information Cardiovascular Support provided to SpecialtyCare and when, but both sides generally agree that

the first set of information sent to SpecialtyCare included various financial statements and tax returns. SpecialtyCare's mergers and acquisitions team, which consisted of Jim Lordeman, Alan Isaacs, and Mike Harper, used the information to calculate Cardiovascular Support's EBITDA—an accounting term for a company's earnings before interest, taxes, depreciation, and amortization—and the parties discussed a purchase price based on that calculation.

As the companies continued to negotiate, Yancey mentioned to SpecialtyCare that Cardiovascular Support's contract with Baylor University Medical Center for perfusion products and services was set to expire soon. Cardiovascular Support and Baylor had signed consecutive contracts for more than twenty years. But in 2011, Baylor expressed concern with the price of Cardiovascular Support's perfusion products—such as heart valves and disposable surgical items—and Cardiovascular Support attempted to negotiate a new contract with Baylor. Meanwhile, Cardiovascular Support's acquisition talks with SpecialtyCare continued and Yancey told SpecialtyCare's mergers and acquisitions team that Mike Sanborn, Baylor's Vice President of Cardiovascular Services, had assured Yancey that Baylor would continue to contract with Cardiovascular Support for perfusion services even if the hospital decided to purchase products directly from a manufacturer.

It is undisputed, however, that Sanborn reached out to SpecialtyCare's then Vice President of Sales Jonathan Womack and asked him to submit a bid for SpecialtyCare to take over perfusion services at Baylor. Sanborn met with Womack and other Baylor and SpecialtyCare representatives to discuss a potential contract with SpecialtyCare as an alternative to a contract with Cardiovascular Support. Sanborn and Womack both testified that Baylor gave Womack information about its perfusion needs so that Womack could prepare a sales proposal. Womack presented SpecialtyCare's proposal to Sanborn and others on July 7, 2011. After

Womack's presentation, Sanborn continued to talk to both Cardiovascular Support and SpecialtyCare about providing perfusion services, but Baylor signed a letter of intent with SpecialtyCare in September of 2011, and then entered into a contract for perfusion services with SpecialtyCare effective December 1, 2011.

Sanborn informed Yancey in October that Baylor had decided to go with another vendor and would not be contracting with Cardiovascular Support. Yancey learned that SpecialtyCare was the other vendor, but acquisition talks between SpecialtyCare and Cardiovascular Support initially continued. The companies even began to work together to recalculate Cardiovascular Support's EBITDA in light of the lost Baylor contract, but the acquisition never took place.

### B.    Procedural History

Cardiovascular Support filed the instant action against SpecialtyCare on March 29, 2013, in Texas state court. SpecialtyCare removed the case to federal court in Texas pursuant to 28 U.S.C. §§ 1332 and 1441, and the case was subsequently transferred to the District Court for the Middle District of Tennessee with the parties' consent. Prior to transfer, Cardiovascular Support filed an amended complaint asserting five separate common-law claims, all of which rest on the allegation that SpecialtyCare's mergers and acquisitions team passed protected confidential information about Cardiovascular Support's relationship with Baylor to the SpecialtyCare sales team, and that the sales team used that information to secure a contract with Baylor. Specifically, Cardiovascular Support's amended complaint contends that SpecialtyCare is liable for: (1) breach of contract or, in the alternative, promissory estoppel; (2) fraud; (3) negligent misrepresentation; (4) tortious interference with a prospective contract; and (5) misappropriation of trade secrets.

Both parties moved for summary judgment on October 31, 2014. On February 18, 2015, the court granted SpecialtyCare's motion for summary judgment, concluding that Cardiovascular Support had failed to present sufficient evidence that SpecialtyCare breached the NDA or used Cardiovascular Support's protected information to win the Baylor contract. Cardiovascular Support filed a motion to alter or amend the court's judgment pursuant to Federal Rule of Civil Procedure 59(e). The court denied that motion, and Cardiovascular Support timely filed a notice of appeal from the court's grant of summary judgment. On appeal, Cardiovascular Support contends that there is sufficient evidence in the record to support its claims for breach of contract, fraud, negligent misrepresentation, tortious interference with a prospective contract, and trade secret misappropriation. It does not raise its promissory estoppel claim. SpecialtyCare maintains that there is insufficient record evidence to support key elements of Cardiovascular Support's various claims.

## II.        STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 842 (6th Cir. 2015). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, we consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (en banc). But the non-moving party "must present affirmative evidence in

order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. And a moving party is entitled to summary judgment when a non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Chapman*, 670 F.3d at 680.

### III.     ANALYSIS

The district court, relying on Tennessee choice-of-law rules, determined that Delaware law governs Cardiovascular Support's breach of contract claim while Texas law controls the remaining claims. Neither party contests the district court's choice-of-law analysis on appeal, and we will apply Delaware and Texas law, respectively, in our de novo review.

### A.     Breach Of Contract

Delaware law requires a plaintiff to prove three elements in order to prevail on a breach of contract claim: (1) "existence of" an "express or implied" contract; (2) "breach of an obligation imposed by that contract; and" (3) "resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). It is undisputed in the present case that the parties' NDA constitutes an express contract. The issue is whether there is a genuine dispute of material fact regarding the elements of breach and resultant damage.

With respect to the element of breach, Sanborn (V.P. of Cardiovascular Services for third-party Baylor) and Womack (SpecialtyCare's sales representative) both testified that Baylor itself gave SpecialtyCare's sales team information about Baylor's perfusion needs in order for SpecialtyCare to prepare its sales proposal. Womack further testified that he did not receive any information regarding Cardiovascular Support from SpecialtyCare's mergers and acquisitions team. Cardiovascular Support has not identified any affirmative evidence to dispute Sanborn and

Womack's testimony. And turning to the record, there is insufficient evidence to support even an inference that SpecialtyCare's mergers and acquisitions team passed confidential information to Womack or any other member of the sales team who worked on the Baylor contract. Cardiovascular Support relies on emails and testimony showing that members of SpecialtyCare's sales team shared information with their mergers and acquisitions team about Cardiovascular Support's known clients. But proof of information about known clientele flowing in one direction from sales to mergers and acquisitions is not affirmative evidence that confidential information about Cardiovascular Support flowed in the other direction from mergers and acquisitions to sales. And Yancey's testimony regarding his conclusory beliefs about the use of Cardiovascular Support's confidential information is not enough to support a reasonable inference that SpecialtyCare breached the NDA. *See Anderson*, 477 U.S. at 248–52.

Cardiovascular Support's only argument to the contrary is that Sanborn's testimony about providing Womack with Baylor's perfusion information is hearsay because SpecialtyCare has not introduced into evidence documents proving that Baylor conveyed any perfusion-related information to SpecialtyCare. This argument fails for at least two reasons. First, Sanborn's testimony is not hearsay. Sanborn was asked during his deposition whether "Baylor provide[d] SpecialtyCare with information to assist it in putting together [a] proposal[.]" (R. 65-1, PageID 845, 20:10–12.) Sanborn answered:

> Yes. There was a standardized information request, I guess. I'm not sure exactly what the title of the document was, but an information request that had to do with case volume, average length of case, how many nurses are in the room, just things that a perfusionist would need to know, especially around the types of cases, valves versus bypass, those types of things. So we got that information from the operating room history and provided that information to SpecialtyCare.

(*Id.* at PageID 845, 20:16–24.) Later in his deposition, when Cardiovascular Support's counsel asked if Sanborn was the person who sent the information to SpecialtyCare, Sanborn replied:

> I'm not sure if that information was sent by me or by purchasing or by our corporate director of perfusion, but it would have been one of the three of us. But we collectively compiled that information in conjunction with operating room staff. . . . I just don't recall if I specifically sent that e-mail or if it would have been another Baylor person that specifically sent that e-mail, but it was communicated to SpecialtyCare.

(*Id.* at PageID 860, 81:6–22.) Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Sanborn testified under oath at his deposition in the present case, and his testimony therefore falls outside the definition of hearsay under the federal rules. *See* Fed. R. Evid. 801 advisory committee's note to 1972 proposed rules ("Testimony given by a witness in the course of court proceedings is excluded [from the definition of hearsay] since there is compliance with all the ideal conditions for testifying."). Second, even if the alleged absence of corroborating documentary evidence might weaken Sanborn's testimony, merely discrediting testimony is "not [normally] considered a sufficient basis for" defeating a motion for summary judgment. *Anderson*, 477 U.S. 256–57 (alteration in original) (quoting *Bose Corp. v Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)). "Instead, the [non-moving party] must present affirmative evidence in" support of its position, and "[t]his is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery[,]" *id.* at 257, as was the case here. To survive the motion for summary judgment, Cardiovascular Support "need only present evidence from which a jury might return a verdict in [its] favor." *Id.* It has failed to do so with respect to the element of breach.

Even assuming that Cardiovascular Support could show that SpecialtyCare breached the NDA, it would still have to present sufficient evidence regarding the third element of breach of contract, resultant harm. In other words, Cardiovascular Support would have to point to affirmative evidence that SpecialtyCare's sales team *used* the confidential information in a way that caused damage. Cardiovascular Support maintains that the sales materials SpecialtyCare used to win the Baylor contract contained or reflected its "Baylor caseload/volumes, disposables costs, personnel costs and salaries," (Appellants' Br. at 14) but provides no affirmative record evidence to support that assertion. Sanborn and Womack both testified that Baylor provided procedure volume information to SpecialtyCare, and Cardiovascular Support has not presented any affirmative evidence to the contrary. And counsel for Cardiovascular Support conceded that the SpecialtyCare sales documents do not reflect any Cardiovascular Support prices. As for salary information, Yancey's allegation that SpecialtyCare's proposal included perfusionist salaries that were higher than the salaries paid to SpecialtyCare's perfusionists in Fort Worth is insufficient to support an inference that SpecialtyCare based its proposed Baylor perfusionist salaries on Cardiovascular Support's confidential information—particularly since Yancey testified that he was unsure whether or not Cardiovascular Support provided SpecialtyCare with Baylor-specific salary information prior to losing the Baylor contract.

Consequently, we hold that Cardiovascular Support has failed to present sufficient evidence to allow a reasonable jury to conclude either that SpecialtyCare breached the NDA by sharing confidential information with its sales department or that such a breach caused any resultant damage to Cardiovascular Support.

##### B. Fraud And Negligent Misrepresentation

Under Texas law, a claim for fraud "requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Zorrilla v. Aypco Contsr. II, LLC*, --- S.W.3d ---, 2015 WL 3641299, at *7 (Tex. June 12, 2015) (citation omitted). Similarly, the elements of a claim for negligent misrepresentation include: (1) a representation "made by a defendant in the course of his [or her] business, or in a transaction in which he [or she] has a pecuniary interest;" (2) "false information" that the "defendant supplies . . . for the guidance of others in their business; (3) the defendant['s] . . . [failure to] exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff['s] . . . justifiabl[e] rel[iance] on the representation" resulting in "pecuniary loss[.]" *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Cardiovascular Support asserts that SpecialtyCare falsely promised to safeguard its information from SpecialtyCare's sales department and that Lordeman misrepresented his job duties at SpecialtyCare by failing to mention his alleged supervision of sales in an executive capacity. According to Cardiovascular Support, both of these acts give rise to viable claims for fraud and negligent misrepresentation because Cardiovascular Support would not otherwise have shared its confidential information with SpecialtyCare, and SpecialtyCare, in turn, would not have secured the contract with Baylor. Viewing the evidence in the light most favorable to Cardiovascular Support, we conclude that both claims founder on the same shoals as the claim for breach of contract. Cardiovascular Support has failed to present affirmative evidence that SpecialtyCare shared and/or used Cardiovascular Support's confidential information to secure

the Baylor contract, and, therefore, there is insufficient evidence in the record to support an inference that Cardiovascular Support's reliance on SpecialtyCare's alleged misrepresentations "caused injury" or resulted in "pecuniary loss." Cardiovascular Support has therefore failed to demonstrate a genuine dispute of material fact with respect to an essential element of its claims for fraud and negligent misrepresentation. *See Celotex Corp.*, 477 U.S. at 322.

### C.       Tortious Interference With A Prospective Contract

In Texas, the elements of a claim for tortious interference with a prospective contract are:

> (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App. 2010). "[I]ndependently tortious" means "conduct that would violate some other recognized tort duty." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). For  instance, "a defendant who threatened a customer with bodily harm if he did business with the plaintiff would be liable for interference because his conduct toward the customer—assault—was independently tortious, while a defendant who competed legally for the customer's business would not be liable for interference." *Id.* The only independent tort Cardiovascular Support identifies is SpecialtyCare's alleged breach of the NDA; and, for the reasons explained above, there is insufficient record evidence to support even an inference that SpecialtyCare breached the NDA by sharing Cardiovascular Support's

confidential information with SpecialtyCare's sales team. Consequently, this claim, too, must succumb to SpecialtyCare's motion for summary judgment. *See Celotex Corp.*, 477 U.S. at 322.[1]

## D. Misappropriation Of Trade Secrets

With respect to Cardiovascular Support's last remaining claim, Texas law requires a plaintiff alleging misappropriation of trade secrets to show that: (1) "a trade secret existed;" (2) "the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and" (3) "use of the trade secret without authorization from the plaintiff." *Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, LLC*, 637 F.3d 604, 610 (5th Cir. 2011). Texas courts weigh the following six non-dispositive factors and "the context of the surrounding circumstances" in order "[t]o determine whether a trade secret exists":

> (1) the extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken to guard the secrecy of the information;
>
> (4) the value of the information to the business and to its competitors;
>
> (5) the amount of effort or money expended in developing the information;
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* Cardiovascular Support maintains that the confidential information it provided to SpecialtyCare constitutes a trade secret, that SpecialtyCare obtained that information through

---

[1]Cardiovascular Support attempts to argue that the district court improperly ruled sua sponte with respect to its claims for tortious interference with contract and misappropriation of trade secrets. But SpecialtyCare moved for summary judgment on these claims, and Cardiovascular Support had ample "notice that [it] had to come forward with all of [its] evidence" or risk dismissal. *Celotex Corp.*, 477 U.S. at 326; *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 816 (6th Cir. 2005).

false representations, and that SpecialtyCare used the information to secure the Baylor contract without Cardiovascular Support's consent. But even if we assume that the first and second elements are met—that Cardiovascular Support's confidential information constitutes a trade secret that SpecialtyCare acquired improperly—Cardiovascular Support still has not presented sufficient evidence to support its contention that SpecialtyCare *used* Cardiovascular Support's confidential information to win the Baylor contract. And, thus, the third essential element of Cardiovascular Support's claim for misappropriation of trade secrets is wanting and summary judgment for SpecialtyCare is appropriate.

## IV. CONCLUSION

Cardiovascular Support has failed to demonstrate a genuine dispute of material fact with respect to its claims, and SpecialtyCare is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.[2] We **AFFIRM** the judgment and order of the district court.

---

[2] Cardiovascular Support contends that the district court erred by failing to address Cardiovascular Support's arguments concerning SpecialtyCare's affirmative defenses; we find, however, that because the district court correctly held that Cardiovascular Support had failed to carry its summary judgment burden as a matter of law, the court was not required to analyze arguments related to affirmative defenses.